1  ELIOT R. HUDSON (Bar No. 66251)
   eliot.hudson@dlapiper.com
2  DLA PIPER LLP (US)
   555 Mission Street, Suite 2400
3  San Francisco, California  94105-2933
   Tel:  415.836.2500
4  Fax: 415.836.2501

5

   Attorneys for Defendants
6  ALLSTATE INSURANCE COMPANY and
   ALLSTATE INDEMNITY COMPANY
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11 ANDREA STEVENSON,                 CASE NO. _____

           Plaintiff,               [Removed from Contra Costa Superior
12                                   Court, Case No. C15-01516]

13     v.                           **NOTICE OF REMOVAL
                                     PURSUANT TO 28 U.S.C. §§ 1332,**
   ALLSTATE INSURANCE CO.; and       **1441 AND 1446**
14 ALLSTATE INDEMNITY CO.,

15         Defendants.               **[FILED CONCURRENTLY WITH
                                     DECLARATION OF PATRICK**
16                                   **CAUSGROVE]**

17                                   Complaint Filed:    August 21, 2015
                                     Discovery Cutoff:   Not Set
18                                   Motion Cutoff:      Not Set
                                     Trial Date:         Not Set
19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
SAN FRANCISCO        EAST\109544280.1            -1-                   NOTICE OF REMOVAL

Defendants Allstate Insurance Company and Allstate Indemnity Company ("Allstate" or "Defendants"), by their undersigned counsel, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, appearing specially so as to preserve any and all defenses available under Rule 12 of the Federal Rules of Civil Procedure, and any and all defenses available under California law, give notice of the removal of this action from the Superior Court for the County of Contra Costa (Case No. C15-01516) to the United States District Court for the Northern District of California.

## I.   JURISDICTION AND INTRADISTRICT ASSIGNMENT

1.   <u>Jurisdiction</u>:  This Court has original diversity jurisdiction over this action pursuant to the provisions of the Class Action Fairness Act of 2005 ("CAFA"), P.L. 109-2, as codified at 28 U.S.C. §§ 1332(d) and 1453, because: (1) the putative class action consists of at least 100 proposed class members; (2) at least one member of the proposed class is a citizen of a State different from at least one defendant; and (3) the matter in controversy, after aggregating the sum or value of each proposed class member's claim, is believed to exceed $5,000,000, exclusive of interest and costs.

2.   <u>Intradistrict Assignment</u>:  This action arises from alleged events that took place in California, including the County of Contra Costa, where Plaintiff Andrea Stevenson is a resident of Richmond, California.

## II.   PROCEDURAL BACKGROUND

3.   On August 21, 2015, Plaintiff Andrea Stevenson filed a "Class Action Complaint for Damages" in the Superior Court of the State of California for the County of Contra Costa naming Allstate Insurance Company and Allstate Indemnity Company as the defendants (the "Complaint"). *See* Complaint & Civil Cover Sheet (Exhibit A).

4.   A notice of removal "shall be filed within thirty days after the receipt by the defendant" of the complaint. 28 U.S.C. § 1446(b). Allstate Insurance Company was served with the Complaint on September 21, 2015. *See* Proof of

1    Service (Exhibit B).  This Notice of Removal is therefore timely.  Although not yet

2    served with the Complaint, Allstate Indemnity Company joins in this Notice of

3    Removal.

4        5.      In the Complaint, Plaintiff attempts to assert, both individually and on

5    behalf of a putative class, claims against Allstate for violation of California's Unfair

6    Competition law and False Advertising law, violation of California Insurance Code

7    Section 1861.10, and for unjust enrichment.  *See* Ex. A at Counts I, II, III, IV, V, VI

8    and ¶ 12.  Plaintiff alleges that Allstate utilized improper rating methodologies,

9    referred to by Plaintiff as "Non-Risk Based Pricing" or NRBP, in setting auto

10   insurance rates in California.  Plaintiff asserts that auto insurance rates must be

11   based solely on certain expressly permitted risk-based factors.  According to

12   Plaintiff, NRBP incorporates consideration of "the policyholder's willingness to

13   tolerate a price increase" when setting rates, thereby "increase[ing] rates for

14   policyholders willing to pay more than they would pay based on the risk they

15   present." *Id*. at ¶¶ 4, 5, 18, 36.  "Defendants have wrongfully and unjustly collected

16   higher auto insurance payments from thousands of insureds than they were entitled

17   to by employing hidden NRBP practices in their pricing methodologies." *Id*. at ¶

18   134.  "The rates thereby produced exceed the risk-based rates that those

19   policyholders would pay absent Defendants use of NRBP." *Id*. at ¶ 51.  As a result,

20   Plaintiff contends that she (and the putative class members) was charged excessive

21   and unfairly discriminatory auto insurance rates.  *Id*. at ¶¶ 43, 106, 113(a), 120(b),

22   129, 146, 147.

23       6.      Plaintiff seeks multiple, broad, and wide ranging forms of legal and

24   equitable relief, including, but not limited to:

25              (i)     injunctive relief.  *Id*. at ¶¶ 115, 122, 140, 147;

26              (ii)    restitution and disgorgement of all profits from the alleged

27   unfair or fraudulent business acts or practices.  *Id*. at ¶¶ 115, 122, 131, 147;

28

DLA PIPER LLP (US)
SAN FRANCISCO

EAST\109544280.1                                                    NOTICE OF REMOVAL

1        (iii)   restitution and/or disgorgement of all revenues obtained by

2  Allstate as a result of their unlawful conduct. *Id*. at ¶ 135;

3        (iv)   restitution and disgorgement of the funds by which Allstate was

4  unjustly enriched. *Id*. at ¶ 140; PRAYER FOR RELIEF, WHEREFORE clause at

5  (E);

6        (v)   declaratory relief that Allstate's policies and practices are

7  unlawful. *Id.* at WHEREFORE clause at (C);

8        (vi)   compensatory damages for Plaintiff and all members of the

9  putative class. *Id.* at WHEREFORE clause at (D);

10        (vii)  attorneys' fees, and non-taxable costs. *Id.* at WHEREFORE

11  clause at (F); ¶ 147;

12        (viii)  taxable costs. *Id.* at WHEREFORE clause at (G); and

13        (ix)   pre- and post-judgment interest. *Id*. at WHEREFORE clause at

14  (H).

15  **III.   REMOVAL IS APPROPRIATE UNDER 28 U.S.C. § 1332**

16      7.   This action is properly removable under 28 U.S.C. §§ 1332(d) and

17  1453 because: (1) the putative class action consists of at least 100 proposed class

18  members; (2) at least one member of the proposed class is a citizen of a State

19  different from at least one defendant; and (3) the matter in controversy, after

20  aggregating the sum or value of each proposed class member's claim, is believed to

21  exceed $5,000,000, exclusive of interest and costs.

22      8.   Plaintiff challenges the auto insurance rates charged by Allstate in

23  California. Ex. A at ¶¶ 2, 4, 5, 11. Notwithstanding that those rates have been

24  submitted to an expressly approved by the California Department of Insurance,

25  Plaintiff contends the approved rates incorporate the use of "Non-Risk Based

26  Pricing" methodologies (a term made up by Plaintiff and also referred to by her as

27  "NRBP"), resulting in higher premiums and the overcharging of certain of

28  Allstate's insureds. *Id*. at ¶¶ 8, 11, 27. Plaintiff's proposed "Class" is defined as:

All Allstate customers in the state of California who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased automotive vehicle insurance and were charged or paid a higher premium than risk-based premium.

*Id.* at ¶ 99.

### A.   The Proposed Class Consists Of At Least 100 Putative Class Members

9.     The Complaint alleges that the putative class consists of "many thousands of members[,]" which satisfies the requirements of 28 U.S.C. § 1332(d)(5).  *Id.* at ¶ 102.

### B.   The Citizenship of At Least One Member of the Putative Class Is Different From That of At Least One Defendant

10.     Plaintiff alleges that she lives in and is a citizen of the State of California.  *Id.* at ¶ 14.  "An individual is a citizen of the state in which he is domiciled; domicile is determined by an individual's 1) residence in a state, and 2) his intent to remain indefinitely."  *Boon v. Allstate Ins. Co.*, 229 F. Supp. 2d 1016, 1019 (C.D. Cal. 2002); *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) (same).  Accordingly, at all relevant times, Plaintiff was a citizen of the State of California.

11.     "[A] corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . . ."  28 U.S.C. § 1332(c)(1).  Allstate Insurance Company and Allstate Indemnity Company are insurance companies organized under the laws of the State of Illinois, with their principal places of business located in Illinois.  Ex. A at ¶ 21; Declaration of Patrick Causgrove ("Causgrove Decl.") at ¶¶ 3, 4.

12.     A corporation's principal place of business is determined by the "nerve center test."  *Hertz Corp. v. Friend*, 559 U.S. 77, 130 S. Ct. 1181, 1192 (2010)

(nerve center is where corporation's officers direct, control, and coordinate the corporation's activities and where the corporation maintains its headquarters); *Tosco Corp. v. Cmtys. For a Better Env't*, 236 F.3d 495, 500 (9th Cir. 2001) (nerve center is where the majority of corporation's executive and administrative functions are performed).  According to the nerve center test, Illinois is Allstate's principal place of business.  *Kuebler v. Allstate Ins. Co.*, 1998 WL 596733 (C.D. Cal. 1998) (determining, as a matter of law, that Allstate's principal place of business is Illinois).  Accordingly, Allstate Insurance Company and Allstate Indemnity Company are citizens of the State of Illinois.  Ex. A at ¶ 21; Causgrove Decl. at ¶¶ 3, 4.  Allstate is not now, and was not at the time of the filing of the Complaint, a citizen of the State of California.

13.    The diversity of citizenship requirement in 28 U.S.C. § 1332(d) is therefore satisfied because Plaintiff and Defendants are citizens of different states.

**C.    The Amount In Controversy Exceeds Five Million Dollars**

14.    The claims of the individual putative class action members are aggregated to determine if the amount in controversy put at issue in the Complaint exceeds $5,000,000.  28 U.S.C. § 1332(d)(6).  In determining whether the amount in controversy has been met, this Court is not limited to the face of the Complaint. *Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) (summary-judgment-type evidence may be considered by the court).  This Court should determine "if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (*e.g.*, damages, injunctive relief, or declaratory relief)." Senate Judiciary Committee Report, S. REP. 109-14, at 42-43; 2005 WL 627977, at *40.  In doing so, "a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint."  *Muniz v. Pilot Travel Ctrs. LLC*, No. CIV S-07-0325 FCD EFB, 2007 WL 1302504, at *3 (E.D. Cal. May 1, 2007) (citing *Kenneth Rothschild Trust v.*

*Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001 (C.D. Cal. 2002)).  The removing defendant "is **not** obligated to 'research, state, and prove the plaintiff's claims for damages.'"  *Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1148 (C.D. Cal. 2010) (citing *Muniz, supra*) (emphasis in original).

15.    Although Plaintiff has not alleged the amount of her individual damages or recovery, or the amount of damages or recovery of the putative class members, the value of the amount in controversy, in the aggregate, exceeds $5,000,000.  Plaintiff alleges that Allstate acted improperly in the rate-setting process for auto insurance and charged improper premiums to their customers.  Ex. A at ¶¶ 43, 51, 106, 113(a),120(b), 129, 146.  As a result, Plaintiff asserts that she (and other class members) has been charged excessive premiums for auto insurance by Allstate during the class period.  *Id.* at ¶ 6; *see also* ¶ 19 ("Had Defendants' NRBP practices been disclosed, Plaintiff (and other Class members) would have paid less for auto insurance.").  Plaintiff contends that her claims are typical of all the "similarly situated" putative class members (*id.* at ¶ 79), and Plaintiff, like all putative class members, "has been damaged by Allstate's misconduct in that she has been charged excessive and unfairly discriminatory auto insurance rates."  *Id.* at ¶ 106.  She now seeks a return of her "excessive" premium and other equitable relief.  *See infra* at ¶ 17.

16.    Allstate Insurance Company and Allstate Indemnity Company acted properly at all times and charged auto insurance premiums in accordance with the rates filed with and approved by the California Insurance Commissioner.  Allstate denies that Plaintiff or the putative class members are entitled to any damages or recovery under the Complaint.  Allstate makes no admission of liability or damages and preserves all defenses.  Nevertheless, it is well-settled that the Court's inquiry centers on the value of the amount put in controversy by the Plaintiff's Complaint, *not* what Allstate might actually owe, if anything.  *Rippee v. Boston Market Corp.*, 408 F. Supp. 2d 982, 986 (S.D. Cal. 2005).

DLA PIPER LLP (US)
SAN FRANCISCO

EAST\109544280.1

NOTICE OF REMOVAL

17.     Because Plaintiff has not alleged a specific amount of potential damages or recovery for herself or for the putative class members, reasonable estimates of the alleged amount in controversy are appropriate. *Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 688 (9th Cir. 2006) (finding that the preponderance of evidence standard applies where a plaintiff does not claim a specific amount in damages). For example, it is reasonable to assume a 100% violation rate absent specific allegations about a rate that is discernably smaller. *Coleman,* 730 F. Supp. 2d at 1150 ("Plaintiff included no limitation on the number of violations, and, taking his complaint as true, Defendants could properly calculate the amount in controversy based on a 100% violation rate."); *Muniz,* 2007 WL 1302504, at *4 (same). This is so because a plaintiff is the "master of [her] claim[s]" and could have alleged specific facts that would narrow the scope of the putative class or damages claimed. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987).

18.     According to Plaintiff, Allstate's alleged use of NRBP methodologies in setting auto insurance rates in California resulted in inflated or excessive premiums. *See, e.g.*, Ex. A at ¶¶ 8, 37, 42, 43. Plaintiff, individually, and for the putative class members, seeks a return of a portion of her premium for the overcharges caused by the alleged use of NRBP, as well as equitable relief of restitution and disgorgement of all profits, revenues or funds obtained by Allstate as a result of such alleged unlawful conduct. *See, e.g., id.* at ¶¶ 115, 122, 131, 135, 140, 147, PRAYER FOR RELIEF, WHEREFORE clause at (E).

19.     During the period of 2011 through 2014, Allstate Insurance Company and Allstate Indemnity Company sold auto insurance in the State of California. Ex. A at ¶ 21; Causgrove Decl. at ¶ 5. All rates used to calculate the premium charged for such auto insurance were first submitted to and approved by the California Insurance Commissioner. Ex. A at ¶ 27; Causgrove Decl. at ¶ 5. The insureds of Allstate Insurance Company and Allstate Indemnity Company were charged

premium calculated on the basis of those approved rates for each vehicle that was covered by an auto insurance policy.  Causgrove Decl. at ¶ 5.

20.    Between 2011 and 2014, Allstate Insurance Company and Allstate Indemnity Company provided renewals of personal lines auto insurance for over 6.7 million vehicles in the State of California.  *See* Causgrove Decl. at ¶ 6 (resulting in an estimate of over 3.63 million auto policies).  For the approximately 6.7 million vehicles for which an auto policy was renewed between 2011 and 2014, Allstate Insurance Company and Allstate Indemnity Company received over $5.4 billion in premiums.  *Id*. at ¶ 7.

21.    Allstate provides the following calculations only to demonstrate that the amount in controversy exceeds the minimum amount under CAFA.  *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010) ("The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability.").  Plaintiff seeks a refund of the allegedly excessive portion of the premiums paid to Allstate for renewal policies of personal lines auto insurance.  *Supra* at ¶ 17.  Assuming that all of the renewal policies for these vehicles were subject to NRBP and the premiums increased by 1% as a result, the amount in controversy would be $54 million.  Even if 10% of the vehicles were subject to the challenged practice with a resulting 1% premium overcharge, the amount in controversy would be $5.4 million.  *Lewis*, 627 F.3d at 400 (plaintiff's allegations of "unauthorized" billings put at issue all billings during the period for the purpose of determining the amount in controversy); *Behrazfar v. Unisys Corp.*, 687 F. Supp. 999, 1004 (C.D. Cal. 2009) ("Since Defendant's calculations were relatively conservative, made in good faith, and based on evidence wherever possible, the Court finds that Defendant has established by a preponderance of the evidence that the amount in controversy exceeds $5,000,000.").

22.    In connection with the unjust enrichment claim, Plaintiff seeks "disgorgement of all revenues obtained by Defendants as a result of their unlawful

DLA Piper LLP (US)
San Francisco

EAST\109544280.1

NOTICE OF REMOVAL

1  conduct." Ex. A at ¶ 135.  Assuming that all of the renewal policies for these

2  vehicles were subject to NRBP, the revenues received by Allstate Indemnity

3  Company and Allstate Insurance Company between 2012 and 2014 are in excess of

4  $5 million.

5      23.  Based on Plaintiff's claims for compensatory damages and

6  disgorgement,[1] the amount in controversy satisfies the minimum requirement for

7  removal.  28 U.S.C. § 1332(d)(6).

8      **D.    No Exceptions To This Court's Jurisdiction Apply**

9      24.  Neither exception to this Court's jurisdiction, as stated in 28 U.S.C. §

10  1332(d)(3) and (4), applies to this action because Allstate is not a citizen of the

11  "State in which the action was originally filed."

12  **IV.  ALL  REQUIREMENTS FOR REMOVAL HAVE BEEN**
13       **SATISFIED**

14      25.  This lawsuit is a civil action within the meaning of the Acts of

15  Congress relating to removal of cases.

16      26.  This Notice of Removal is timely filed under 28 U.S.C. § 1446(b)

17  because it is being filed within thirty (30) days after the receipt of the Summons and

18  Complaint in this action by Allstate Insurance Company and Allstate Indemnity

19  Company through service of process.

20  _____

21  [1] Plaintiff also seeks injunctive and declaratory relief and to recover attorneys' fees
   for a violation of Section 1861 of the Insurance Code (*see* Ex. A at ¶ 147), which

22  also are considered in evaluating the amount in controversy.  *Galt G/S v. JSS
   Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) (attorneys' fees considered);

23  *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir.) cert. denied, 459 U.S.

24  945 (1982) (same); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333,
   347 (1977) (the value of the object being litigated is considered for injunctive relief

25  claim); *Gibson v. Chrysler Corp.*, 261 F.3d 927, 946 (9th Cir. 2001); *Valdez v.

26  Metro Prop. & Caus. Ins. Co.*, 867 F. Supp. 2d 1143, 1165 (D.N.M. 2012) (finding
   that courts may consider the costs associated with the relief sought).  Consideration

27  of all Plaintiff's claims further demonstrates that the value of the amount placed in

28  controversy far exceeds $5 million.

27.     In accordance with 28 U.S.C. § 1446(a), "a copy of all process, pleadings, and orders served upon" Allstate are attached as Exhibits A, B and C.[2]

28.     Pursuant to 28 U.S.C. § 1446(d), a copy of the Notice of Removal to United States District Court for the Central District of California is being filed with the Superior Court for the County of Contra Costa.  A copy of the Notice to State Court and Adverse Party of Removal of Action to Federal Court (which is being served on Plaintiffs), without exhibits, is attached hereto as Exhibit D.

29.     The prerequisites for removal under 28 U.S.C. §§ 1441 and 1446 have been met.  If any questions arise as to the propriety of the removal of this action, Allstate requests the opportunity to present a brief, oral argument, and further evidence as necessary to support its position that this case is removable to this Court.  *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 n.1 (9th Cir. 2002).  By filing this Notice of Removal, Allstate does not waive any defenses to the claims asserted by Plaintiff that may be available to Allstate, nor does Allstate concede that Plaintiff has stated any claim upon which relief may be granted.

## V.     CONCLUSION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.  Therefore, Defendants Allstate Insurance Company and Allstate Indemnity Company remove this case to the United States District Court for the Northern District of California, being the District for the county in which this action is pending, and respectfully request that the filing of this Notice of Removal in this Court and with the Superior Court for the County of Contra Costa, California, shall

---

[2] The Summons and Notice of Assignment to Department Seventeen for Case Management Determination are collectively attached as Exhibit C.

1  effect removal of this suit to this Court, and that no further proceedings be had in

2  this case in the Superior Court for the County of Contra Costa.

3

4  Dated:  October 16, 2015              DLA PIPER LLP (US)

5

6                                       By /s/ Eliot R. Hudson

7                                          ELIOT R. HUDSON
                                           Attorneys for Defendants
                                           ALLSTATE INSURANCE COMPANY
8                                          and ALLSTATE INDEMNITY
                                           COMPANY
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

David Borgen (dborgen@gbdhlegal.com)
James Kan (jkan@gbdhlegal.com)
GOLDSTEIN, BORGEN, DARDARIAN AND HO
300 Lakeside Drive, Suite 1000, Oakland, CA 94612
TELEPHONE NO.: 510-763-9800      FAX NO.: 510-835-1417
ATTORNEY FOR *(Name):* Andrea Stevenson

FILED
2015 AUG 21  A 10: 47
STEPHEN H. NASH
CLERK OF THE SUPERIOR COU
COUNTY OF CONTRA COSTA, CA
BY:
D. WEBDY G

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Contra Costa
STREET ADDRESS: 725 Court Street
MAILING ADDRESS:
CITY AND ZIP CODE: Martinez CA 94553
BRANCH NAME: Wakefield Taylor Courthouse

CASE NAME:
Stevenson v. Allstate Insurance Co., and Allstate Indemnity Co.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: C15 - 01516 |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☑ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):* Six
5. This case ☑ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: August 20, 2015
David Borgen
_____          ► _____
(TYPE OR PRINT NAME)                       (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]                **CIVIL CASE COVER SHEET**                Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

1   David Borgen (SBN 99354)
    dborgen@gbdhlegal.com
2   James Kan (SBN 240749)
    jkan@gbdhlegal.com
3   GOLDSTEIN, BORGEN, DARDARIAN & HO
    300 Lakeside Drive, Suite 1000
4   Oakland, CA  94612
    Tel:  (510) 763-9800
5   Fax: (510) 835-1417

6   Jay Angoff (D.C. Bar 248641)
    Cyrus Mehri (D.C. Bar 420970)
7   Steven Skalet (D.C. Bar 359804)
    MEHRI & SKALET PLLC
8   1250 Connecticut Avenue NW, Suite 300
    Washington, DC 20036
9   Tel:  (202) 822-5100

10  Attorneys for Plaintiff
    *(Additional Counsel listed on Signature Page)*



11

12          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13              **FOR THE COUNTY OF CONTRA COSTA**

    **C15-01516**

14  ANDREA STEVENSON,                    Case No.:

15          Plaintiff,                   **CLASS ACTION COMPLAINT FOR
                                         DAMAGES**
16  vs.
                                         1.  **Violation of the Unfair Competition Law
17  ALLSTATE INSURANCE CO., and ALLSTATE     – Commission of Unlawful Business Act
    INDEMNITY CO.,                           or Practice Cal. Bus. & Prof. Code
18                                           § 17200 et seq.**
            Defendants.
19                                       2.  **Violation of the Unfair Competition Law
                                             – Commission of Unfair Business Act or
20                                           Practice Cal. Bus. & Prof. Code
                                             § 17200  et seq.**
21
                                         3.  **Violation of the Unfair Competition Law
22                                           – Commission of Fraudulent Business Act
                                             or Practice Cal. Bus. & Prof. Code
23                                           § 17200 et seq.**

24                                       4.  **Unjust Enrichment**

25                                       5.  **Violation of the False Advertising Law
                                             Cal. Bus. & Prof. Code § 17500 et seq.**
26
                                         6.  **Violation of Cal. Ins. Code § 1861.10**
27
                                         **JURY TRIAL DEMANDED**
28

584527.4                    CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiff Andrea Stevenson ("Plaintiff"), brings this action on behalf of herself and all others similarly situated against Defendants Allstate Indemnity Company and Allstate Insurance Company (collectively referred to herein as "Allstate"). Plaintiff, through undersigned counsel, alleges the following based on personal knowledge as to allegations regarding Plaintiff and on information and belief as to other allegations.

## NATURE OF THE ACTION

1.      In California, as in all other states, drivers are required to maintain auto insurance. For many consumers, who may own more than one vehicle, auto insurance costs take up a considerable portion of a household's monthly budget.

2.      Auto insurance companies are not permitted to determine auto insurance rates on the basis of what the market will bear.

3.      Instead, all states have laws requiring that auto insurance companies, including Defendants, calculate their rates based on the risk presented by the policyholder, meaning those objectively discernible characteristics or facts about the insured person which directly impact the likelihood of a covered event occurring (and thus, the cost to the insurer of providing the offered insurance).

4.      This case arises from Defendants' practice of using rating methodologies that are based not on the risk presented by the policyholder but rather on the policyholder's willingness to tolerate a price increase.

5.      In particular, instead of determining rates based only on permissible risk-based factors, Defendants engage in Non-Risk Based Pricing ("NRBP") in order to increase rates for policyholders willing to pay more than they would pay based on the risk they present.

6.      NRBP harms policyholders who Defendants judge to be less price-sensitive and more loyal to Defendants—they pay more than they would pay if Defendants used only risk-based factors.

7.      Defendants have compiled or reviewed data indicating that people with certain (non-risk based) characteristics are willing to pay more than they should pay based on the risk they present. That data indicates, among other things, that their most loyal customers are willing to pay more than new customers who present the same risk.

1

584527.4

8.     NRBP thus results in the Defendants' most loyal customers paying more than they would pay based on the risk they present.

9.     Defendants do not disclose their behind-the-scenes use of NRBP to their customers or regulatory authorities.

10.     In their marketing materials, Defendants intentionally omit and fail to disclose their use of NRBP—specifically, their consideration of the policyholder's willingness or unwillingness to tolerate a price increase, or more technically, the policyholder's "elasticity of demand"—in determining auto insurance rates.

11.     Plaintiff and members of the Class have paid higher prices for their insurance coverage than have other insureds who present the same risk presented by Plaintiff.

12.     Plaintiff brings this action on behalf of herself and other similarly situated insureds for violation of California's Unfair Competition law and False Advertising law, violation of California Insurance Code Section 1861.10, and for unjust enrichment.

## JURISDICTION AND VENUE

13.     This action is properly brought in the Superior Court of the State of California.  Each cause of action enumerated below arises from California state law and the events giving rise to this lawsuit took place in California, including the County of Contra Costa.

## PARTIES

14.     Plaintiff Andrea Stevenson is a citizen of the State of California and is a customer of Defendants.  Ms. Stevenson resides in Richmond, California in the County of Contra Costa.

15.     Plaintiff has been a loyal customer of Defendants for more than 25 years.

16.     Plaintiff has purchased auto insurance from Defendants.  Currently, Plaintiff purchases auto insurance for one vehicle from Defendants.

17.     Defendants have never notified Plaintiff that they are charging her more than other policyholders presenting the same risk because of her willingness to tolerate a price increase.

18.     As explained in more detail below, Plaintiff has been injured in fact and directly harmed as a result of Defendants' failure to disclose their practice of NRBP, in that Plaintiff has been

CLASS ACTION COMPLAINT FOR DAMAGES

584527.4

1  fraudulently, deceptively and unfairly misled into paying a premium that has been artificially inflated

2  due to Defendants' use of her willingness to tolerate a higher price in determining her rates.

3      19.    A direct causal relationship exists between Defendants' unlawful conduct and the

4  ascertainable losses suffered by Plaintiff and the Class.  Had Defendants' NRBP practices been

5  disclosed, Plaintiff (and other Class members) would have paid less for auto insurance.

6      20.    The excessive portion of the artificially inflated premiums paid by Plaintiff and the

7  Class is exclusively in Defendants' possession.  The overage amount is identifiable as the difference

8  between the rate amounts calculated by Defendants before and after employing NRBP.

9      21.    Defendants Allstate Indemnity Company and Allstate Insurance Company are Illinois

10  corporations with their principal place of business in Illinois.  Allstate Insurance Company and Allstate

11  Indemnity Company issue automotive insurance in various states, including California, and throughout

12  the country.

13      22.    Consumers obtain auto insurance via Allstate agencies, independent agencies and

14  Allstate exclusive financial representatives, as well as via www.allstate.com and 1-800 Allstate®.

## COMMON FACTUAL ALLEGATIONS

### How Auto Insurance Rates Are Set

17      23.    Auto insurance rates are set by actuaries.  The actuary determines the base rate for a

18  given year for a given coverage based on, among other things, the amount the insurer has paid out in

19  the past for that coverage, the timing of those payouts, and the actuary's assumptions about future

20  conditions, including the rate of inflation.

21      24.    Insurance companies then determine individual policyholder premiums by multiplying

22  the base rate by a series of numbers, called relativities, corresponding to the policyholder's ranking on

23  various rating factors.  Those factors include driving record, mileage driven, sex, territory, and many

24  others.

25      25.    The relativity applied to each of these rating factors for each policyholder will vary

26  depending on the specific qualities of each policyholder.  For example, the relativity for the driving

27  record rating factor will vary depending on the accidents and violations the policyholder has had; the

28  relativity for the mileage driven rating factor will vary depending on the number of miles the

3

584527.4

policyholder drives annually; and the relativities for the sex and territory rating factors will vary depending on the policyholder's sex and place of residence.  To produce the premium for any customer, the base rate is multiplied by the relativity that applies to that customer for each rating factor.

26.    Thus, the formula used to produce any customer's premium is the same: the base rate times the factor corresponding to the risk the customer presents in connection with each rating characteristic.

27.    California law requires "[e]very insurer which desires to change any rate [to] file a complete rate application with the commissioner," and defines a complete rate application to include information that the commissioner "may require." Cal. Ins. Code § 1861.05 (West).

28.    A rate filing must also include an "Explanatory Memorandum," which is a narrative explaining the different elements of the rate filing.

29.    California law also directs that "[n]o person, insurer or organization shall willfully withhold information from, or knowingly give false or misleading information to, the commissioner or to any rating organization, advisory organization, insurer or group, association or other organization of insurers, which will affect the rates, rating systems or premiums for the classes of insurance to which the provisions of this chapter are applicable." Cal. Ins. Code § 1859 (West).

**Legal Standards Applicable To Insurance Rates and Rating Factors In California**

30.    In California, auto insurance rates must not be "excessive, inadequate, unfairly discriminatory or otherwise in violation of [the California Insurance Code]."  Cal. Ins. Code § 1861.05 (West).

31.    Under California law, an auto insurance rate is "excessive" if the rate is "expected to yield the reasonably efficient insurer a profit that exceeds a fair return on the investment used to provide the insurance."  Cal. Code Regs. Tit. 10, § 2642.1.  The regulation adds that "[i]n determining whether a rate is excessive, the Commissioner shall consider the competing interests of consumers in lower prices and of investors in prices that yield high returns, and the Commissioner shall consider the fact that insurance is imbued with the public interest and is sometimes legally required."  *Id.*

CLASS ACTION COMPLAINT FOR DAMAGES

584527.4

32.     California law defines "rating factor" as "any factor, including discounts, used by an insurer which establishes or affects the rates, premiums, or charges assessed for a policy of automobile insurance." Cal. Code Regs. Tit. 10, § 2632.2(a).

33.     In California, three mandatory rating factors are authorized by statute:  mileage driven, driving record, and years of driving experience.  Cal. Ins. Code sec. 1861.02(a).

34.     The statute also authorizes the Commissioner to adopt additional rating factors by regulation and prohibits the use of rating factors that do not have a substantial relationship to the risk of loss.  Cal. Ins. Code sec. 1861.02(a)(4).  The Department has promulgated a regulation setting forth the rating factors insurers are permitted to use, Cal. Ins. Code sec. 2632.5(d), and has specifically provided that "No insurer shall use a rating factor which is not set forth in these regulations,"  Cal. Code Regs. 2632.4(a) and that "No insurer shall use a rating factor...in a manner that does not bear a substantial relationship to loss."  Cal. Code Regs. 2632.4(b).  The Commissioner has not adopted elasticity of demand as a rating factor, and thus does not permit insurers to use elasticity of demand to "establish[] or affect[] the rates, premiums, or charges assessed for a policy of automobile insurance." Cal. Ins. Code sec. 2632.2(a).

35.     California law also provides that "no insurer may hereafter use a class plan, or charge or collect a premium which does not comply with" the California Insurance Code or the regulations of the Department of Insurance.  Cal. Code Regs. Tit. 10, § 2632.10(a).

**Non-Risk Based Pricing ("NRBP")**

36.     NRBP is a predictive modeling process by which insurers, including Defendants, charge policyholders higher prices based on their willingness to pay more than they would pay based on the risk they present, as calculated by Defendants.

37.     When an insurer uses NRBP, two groups of people which present the same risk will be charged different prices for insurance; the group willing to pay a higher price will be charged a higher price.

38.     "Elasticity of demand" is the technical term for an individual's sensitivity to price changes.

39.     An individual whose demand is elastic is sensitive to price changes, *i.e.*, he or she will seek insurance elsewhere in response to a relatively small price increase.  The more sensitive the individual is to price changes – *i.e.*, the smaller the increase in price that will cause the individual to shop – the more elastic is that individual's demand.

40.     Conversely, an individual whose demand is inelastic is relatively non-sensitive to price changes – he or she is relatively unlikely to seek insurance elsewhere in response to a price increase.  The more the insurer can raise its prices to such an individual without causing him or her to switch carriers, the more inelastic that individual's demand is.

41.     Defendants use NRBP to identify customers whose demand is inelastic—who are unlikely to seek insurance elsewhere in response to a price increase—and to charge these customers more than customers who are likely to shop around in response to a price increase.  The former group of customers thus pays a higher price than the latter group, even though both groups present the same risk.

42.     Defendants' customers whose demand is inelastic thus pay prices that are "excessive" under California law, because they pay more than they would pay based on the risk they present.

43.     The inflated rates paid by Defendants' customers whose demand is inelastic are also "unfairly discriminatory" under California insurance law, because those rates are higher than the rates paid by customers with the same projected loss costs whose demand is elastic.

44.     Defendants' parent company, The Allstate Corporation, has admitted to using NRBP in its annual Form 10-K reports to the Securities and Exchange Commission.

45.     For instance, in The Allstate Corporation's 2011 Form 10-K report, it stated that one of its "key goals" was to "improve auto competitive position through price optimization [referred to herein as NRBP]".  The Allstate Corporation further stated that its "updated auto risk pricing model"— which it refers to as "price optimization" —was "implemented for 25 states in 2011 and…will continue in other states throughout 2012."

46.     In The Allstate Corporation's 2012 and 2013 Form 10-K reports, The Allstate Corporation omits any reference to the specific term "price optimization" but still discuss its use of "sophisticated pricing" to enhance its competitive position.

47.     In The Allstate Corporation's 2012 Form 10-K report, The Allstate Corporation states that its "updated auto risk pricing model" was "implemented for 9 states in 2012."

48.     In The Allstate Corporation's 2013 Form 10-K report, The Allstate Corporation admits that its "increasingly sophisticated pricing models" are "being reviewed by regulators and special interest groups."

49.     In The Allstate Corporation's 2014 Form 10-K report, The Allstate Corporation again admits that its "increasingly sophisticated pricing models" are "being reviewed by regulators and special interest groups."

50.     Defendants do not include an explicit elasticity of demand factor in their rating methodologies, since this factor is unrelated to the risk presented by the policyholder and would be disallowed if made known to the Insurance Commissioner.

51.     Rather, Defendants conceal their use of NRBP. They do this by increasing the relativities for rating characteristics that are associated with a willingness to tolerate a price increase. The rates thereby produced exceed the risk-based rates that those policyholders would pay absent Defendants' use of NRBP.

**California Has Specifically Prohibited NRBP, As Have Other States**

52.     The term commonly used by insurance companies and insurance regulators for NRBP is "price optimization." On February 18, 2015, the California Department of Insurance issued a bulletin (the "Bulletin") announcing that "any use of Price Optimization in the ratemaking/pricing process or in a rating plan is unfairly discriminatory in violation of California law," and ordering any insurer using price optimization to discontinue doing so. The Bulletin defines "price optimization" as "any method of taking into account an individual's or class's willingness to pay a higher premium relative to other individuals or classes." It also notes that "price optimization does not seek to arrive at an actuarially sound estimate of the risk of loss and other future costs of a risk transfer."

53.     The California Department of Insurance further explained how price optimization works in a press release accompanying its Bulletin:

> Because price optimization does not use actuarially sound methods to estimate the risk of loss, its use in the ratemaking process is unfairly discriminatory and violates California law.   Insurers have utilized price optimization by applying sophisticated

7

models that allow them to identify trends that predict at what price point a consumer would terminate his or her policy or comparison shop. Insurers have relied on these complex models to price policies based on what they believe a consumer will pay, instead of risk based factors as required by law.

54.     The insurance departments of Maryland and Ohio have also issued bulletins finding that price optimization is unfairly discriminatory, and thus violates the insurance statutes of those states.

55.     The insurance department of New York has sent out a questionnaire asking insurers that use price optimization to list all of the policy characteristics that they incorporate into their price optimization models

**Consultants Have Pitched NRBP to Defendants on the Grounds that It Will Increase Their Profits**

56.     Consulting companies have collected extensive data on the elasticity of demand of people with various characteristics and have developed analytic software systems for insurers to use this data (and/or data collected by the insurers themselves) in ratemaking. They market their services to insurers to assist them in incorporating NRBP into their rating methodologies.

57.     For instance, upon information and belief, Defendants have used the NRBP software package offered by consulting company, Earnix Ltd., to enable them to incorporate elasticity of demand into their rating methodology. Earnix Ltd., as well as insurers, frequently use the term "price optimization" as a shorthand reference for this practice of varying the risk-based rates by use of factors other than the risk of loss, such as elasticity of demand.

58.     An Allstate actuary has stated that he uses "Price Optimization in Earnix" in his work at Allstate to "driv[e] pricing efficiency and effectiveness."

59.     Earnix Ltd. ("Earnix") was founded in 2001 and has its United States headquarters in Westport, Connecticut.

60.     Earnix developed and sells its "Integrated Pricing and Customer Analytics" to banks and insurance companies, including Defendants. *See* Exhibit A, Earnix Brochure, "Price Optimization in North America:  Myth vs. Reality", September 2012, at p. 1., available at http://earnix.com/whitepaper-price-optimization-in-north-america-myth-vs-reality/2129/.

584527.4

61.     According to IBM, the platform supplier for Earnix's Optimizer software, "the rating factors in a rating structure can be optimized directly where regulatory environment does not allow individual pricing (e.g. USA)", available at https://www-304.ibm.com/software/brandcatalog/puresystems/centre/details?uid=GSD_11719.  Optimizing rating factors refers to adjusting the rating factor from one that is based on the risk presented by the policyholder to one that takes into consideration an individual's inelasticity of demand, *i.e.*, her willingness to pay a higher price, as illustrated in Exhibit B (chart included on Earnix's website at www.earnix.com).

62.     Earnix states that its software enables insurers to "go beyond traditional risk *cost* pricing, incorporating demand elasticity models to maximize profit and growth objectives."  It explains that "[i]n today's competitive insurance market, traditional ratemaking based on risk and cost alone is no longer sufficient."  *See* Exhibit C, Earnix Brochure, "Insurance Pricing and Customer Value Optimization", at p. 2, available at http://earnix.com/download/EarnixInsuranceSolutions.pdf.

63.     The reason traditional cost-based ratemaking is no longer sufficient, according to Earnix, is that "[t]here are cases in which consumers may be willing to pay a higher price than what insurers are charging." https://www-304.ibm.com/software/brandcatalog/puresystems/centre/details?uid=GSD_11719.

64.     A trade publication has characterized Earnix as "applying predictive analytics to the insurance and financial industries to identify various pain points—areas where clients can raise prices without impacting customer retention."  *See* http://data-informed.com/earnix-develops-predictive-analytics-optimized-pricing-for-insurers/.

65.     According to Earnix, "[t]he financial benefits of price optimization can be significant" for its insurer clients. *See* Exhibit A, Earnix Brochure, "Price Optimization in North America:  Myth vs. Reality", September 2012, at p. 2. "Companies that adopt optimization as a pricing strategy can realize improvement of 1-4 points in the combined ratio . . . ." *Id*.

66.     Other NRBP consultants have also boasted about how their technology enables insurers to earn higher profits than they could earn under the traditional lawful cost-based pricing.

67.     For example, in a 2007 brochure, consulting company Towers Watson explained that:

9

584527.4

1    Traditionally, many industries, including the insurance industry, have priced their goods and services based on supply-side factors (cost to produce the product plus a margin for profit). However, this cost-plus-profit approach leaves a lot of money on the table in the form of lower margins from existing customers.

4    68.    In a 2009 paper, actuaries Serhat Guven of Towers Perrin and Michael McPhail of

5    USAA explained the effect of NRBP in the following way:

6        Suppose a mature segment of a firm's book of business has a traditional actuarial rate indication of minus 10%. In addition to this, assume the segment has a low PED [price elasticity of demand] relative to the rest of the book. Now, assume the firm runs an optimization routine designed to increase overall demand. Due to the low PED of the mature segment, the optimized rate will most likely be higher than the current rate since that particular segment is less price sensitive.

10   **Defendants Hide Their Use of NRBP From Their Customers and Regulators**

11   69.    Defendants provide customers and potential customers with information regarding their

12   auto insurance policies, practices, and rates via marketing materials, including Allstate's website,

13   www.allstate.com.

14   70.    Yet, Defendants hide their use of NRBP from customers and potential customers.

15   71.    For instance, Defendants maintain a page on their website titled "Understanding Your

16   Car Insurance Quote." *See* http://www.allstate.com/tools-and-resources/car-insurance/understanding-

17   your-online-car-insurance-quote.aspx.

18   72.    On that website page, Defendants include a section that purports to explain "How a car

19   insurance quote is determined."

20   73.    In that section, Defendants state: "The quote you receive is impacted by the following

21   factors:  Your driving record. Your past insurance claims history. Your vehicle type and value.

22   Included safety features in your car, which could effectively limit the extent of bodily damage you

23   suffer in an accident.  Included security features in your car, such as anti-theft alarms or devices, which

24   are likely to have an impact on preventing your car from being stolen. Where you live, which could

25   directly influence the safety of your car with respect to theft and certain natural disasters. How often

26   you drive, which tells an insurance company how frequently your car is exposed to risk."

27   74.    Defendants do not inform insureds that they are using NRBP and their car insurance

28   rates are impacted—or, more specifically, increased—by their willingness to accept a price increase.

10

584527.4

75.     Defendants' website also includes a page entitled "How Much Can Car Insurance Cost?" *See* http://www.allstate.com/tools-and-resources/car-insurance/car-insurance-cost.aspx. On that page, Defendants again list the factors that impact the cost of car insurance. *Id.* However, Defendants do not inform customers that their willingness to accept a price increase is also used to determine the cost of their auto insurance. *Id.*

76.     Defendants' website also includes a page entitled "Many Factors Affect Your Auto Insurance Premium." *See* http://www.allstate.com/tools-and-resources/car-insurance/factors-affect-your-auto-insurance.aspx. On that page, Defendants again list the factors that impact the cost of car insurance. *Id.* And, again, Defendants fail to disclose to consumers that their willingness to accept a price increase is a factor in calculating their auto insurance prices. *Id.*

77.     NRBP consultants have also boasted about the fact that NRBP is hidden from regulators and therefore that regulators cannot tell whether an insurer is using an individual's willingness to pay a higher rate than the risk-based rate in its computations.

78.     For example, in a presentation to the National Association of Insurance Commissioners Study Group (NAIC), NRBP consulting company Towers Watson stated in writing that the "regulatory process remains the same" because there is "[n]o easy way to see if a company is or is not using the tool."

79.     In one of its brochures, Earnix states that the "filing process is typically identical whether a company utilizes price optimization or not." In other words, Earnix does not refute that its software programs enables insurer clients, such as Defendants, to use inelasticity of customers' demand as a non-risk based factor to maximize the premiums to be paid by these customers.

**NRBP Violates Actuarial Standards**

**The Casualty Actuarial Society's Statements of Principles**

80.     The Casualty Actuarial Society (CAS) is the professional association of property/casualty actuaries.

81.     According to the CAS, "actuaries are required to adhere to the high standards of conduct, practice, and qualifications of the actuarial profession, thereby supporting the actuarial profession in fulfilling its responsibility to the public."

11

82.     One of the purposes of the CAS is "to promote and maintain high standards of conduct and competence."

83.     The CAS establishes standards, called Statements of Principles, for property/casualty actuaries.

84.     The CAS has promulgated a Statement of Principles Regarding Property and Casualty Insurance Ratemaking which includes four principles, all of which are aimed at ensuring that rates are based on the expected cost of providing the coverage—the risk presented by the policyholder—and not on non-risk-related factors such as elasticity of demand.

85.     NRBP violates all four of these principles.

86.     Principle 1 states "[a] rate is an estimate of the expected value of future costs."

     a.     NRBP violates this principle because it results in rates that are higher than the expected value of future costs for those who are willing to pay more than the risk-based rate.

87.     Principle 2 states "[a] rate provides for all costs associated with the transfer of risk," and the comment to that principle states "[r]atemaking should provide for the costs of an individual risk transfer so that equity among insureds is maintained."

     a.     NRBP violates this principle because it results in prices that exceed the costs of an individual risk transfer and ensures inequity among insureds by causing individuals with the same projected loss costs to pay different prices based on their willingness or unwillingness to pay more than the risk-based rate.

88.     Principle 3 states "[a] rate provides for the costs associated with an individual risk transfer."

     a.     NRBP violates this principle because it produces prices that include not only the costs of an individual risk transfer but also additional, non-risk-related charges for those who are willing to pay them.

89.     Principle 4 states "[a] rate is reasonable and not excessive, inadequate, or unfairly discriminatory if it is an actuarially sound estimate of the expected value of all future costs associated with an individual risk transfer."

584527.4

a.    NRBP violates this principle because it produces higher prices for customers whose demand is inelastic that exceed the expected value of all costs associated with an individual risk transfer.

90.    NRBP also violates the instructions contained in the CAS Statement of Principles regarding Actuarial Judgment (the "Statement").

91.    The Statement provides that "[i]nformed actuarial judgments can be used effectively in ratemaking.  Such judgments may be applied throughout the ratemaking process and should be documented and available for disclosure."

92.    Actuaries preparing rate filings which contain rating factors that have been adjusted so that those willing to pay more than the risk-based rate do so violate this principle for two reasons.  First, such actuaries are not using their actuarial judgment, informed or otherwise, in ratemaking.  To the contrary, Defendants are adjusting the rating factors based on a formula designed to maximize their profits in violation of actuarial principles.  Second, Defendants do not disclose the fact that they have so adjusted their rating factors, nor do they disclose the calculations they have used to make such adjustments.

**The Actuarial Standards Board's Actuarial Standards of Practice**

93.    The Actuarial Standards Board (ASB) promulgates actuarial standards of practice (ASOPs) for all actuaries in the United States.

94.    ASOPS are binding on all members of the Casualty Actuarial Society.

95.    NRBP violates the ASB's ASOP entitled "Actuarial Communications." That Standard provides that in the actuarial report, "the actuary should state the actuarial findings, and identify the methods, procedures, assumptions, and data used by the actuary with sufficient clarity that another actuary qualified in the same practice area could make an objective appraisal of the reasonableness of the actuary's work as presented in the actuarial report."

96.    Actuaries using NRBP do not identify their methods with sufficient clarity to enable another actuary to evaluate the reasonableness of their work.

97.    Actuaries using NRBP do not identify their NRBP methods at all.

## CLASS ALLEGATIONS

98.    Plaintiff, on behalf of herself and all others similarly situated, brings this action pursuant to California Code of Civil Procedure Section 382.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements.

99.    The proposed Class is defined as:

> All Allstate customers in the state of California who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased automotive vehicle insurance and were charged or paid a higher premium than the risk-based premium.

100.    Excluded from the Class is Allstate, its parents, subsidiaries, affiliates, officers and directors, any entity in which Allstate has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

101.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

102.    The Class is numerous such that joinder of all Class members is impracticable.  The proposed Class contains many thousands of members.

103.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  The common legal and factual questions include, but are not limited to, the following:

a.    Whether Defendants consider Class members' price elasticity in setting the price charged to the Class member;

b.    Whether Defendants use NRBP to manipulate traditional rating factors;

c.    Whether Defendants' use of NRBP produces rates that exceed the risk-based rates;

d.    Whether Defendants' use of NRBP produces rates that are higher than the expected value of future costs for those policyholders who have inelastic demand;

CLASS ACTION COMPLAINT FOR DAMAGES

584527.4

e.   Whether Defendants' use of NRBP results in customers presenting the same risk being charged different rates based on elasticity of demand;

f.   Whether the rates charged by Defendants using NRBP are excessive;

g.   Whether the rates charged by Defendants using NRBP are unfairly discriminatory;

h.   Whether Defendants use NRBP to charge inflated rates that are not strictly related to individual risk transfer;

i.   Whether Defendants are unjustly enriched through their NRBP policies and practices;

j.   Whether Defendants violate California's Unfair Competition Law through their NRBP policies and practices;

k.   Whether Defendants violate California's False Advertising law through their NRBP policies and practices.

104.   Other questions of law and fact common to the Class include:

a.   The proper method or methods by which to measure damages, and

b.   The declaratory relief to which the Class is entitled.

105.   Plaintiff's claims are typical of the claims of other members of the Class and there is no defense available to Defendants that is unique to Plaintiff.

106.   The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, has been subjected to Defendants' NRBP methodology wherein Defendants included a policyholder's willingness to pay more than the risk-based rate in determining their rate.  The representative Plaintiff, like all Class members, has been damaged by Allstate's misconduct in that she has been charged excessive and unfairly discriminatory auto insurance rates. Furthermore, the factual basis of Allstate's misconduct is common to all Class members, and represents a common thread of deceptive, unfair, and unlawful conduct resulting in injury to all members of the Class.

107.   Plaintiff will fairly and adequately represent the interests of the Class.  Plaintiff has no interests that are antagonistic to those of the Class.  Plaintiff has the ability to assist and adequately

1    protect the rights and interests of the Class during litigation.  Further, Plaintiff is represented by

2    counsel who are competent and experienced in this type of class action litigation.

3        108.    This class action is not only the appropriate method for the fair and efficient

4    adjudication of the controversy, it is the superior method because:

5        a.    Joinder of thousands of individual Class members is impracticable,

6            cumbersome, unduly burdensome, and a waste of judicial and litigation

7            resources;

8        b.    There is no special interest by the Class members in individually controlling

9            separate causes of action;

10       c.    The Class members' individual claims are small compared with the expense of

11           litigating the claim thereby making it impracticable, unduly burdensome, and

12           expensive, if not totally impossible, to justify individual Class members

13           addressing their losses in litigation;

14       d.    When liability is determined, the claims of all Class members can be determined

15           through routine mathematical calculations and thus can be determined by the

16           Court and administered efficiently in a manner that is far less onerous,

17           burdensome, and expensive than if it were attempted through filing, discovery,

18           and trial of many individual cases;

19       e.    This class action will promote the orderly, efficient, expeditious, and appropriate

20           adjudication and administration of class claims to promote economies of time

21           and resources;

22       f.    This class action will assure uniformity of decisions among Class members;

23       g.    The resolution of this controversy through this class action presents fewer

24           management difficulties than individual claims filed in which the parties may be

25           subject to varying adjudication of their rights.

26       109.    Furthermore, class treatment is appropriate because Defendants have acted on grounds

27   generally applicable to the Class, making class-wide equitable, injunctive, declaratory and monetary

28   relief appropriate.  In addition, the prosecution of separate actions by or against individual members of

16

the Class would create a risk of incompatible standards of conduct for Defendants and inconsistent or varying adjudications for all parties.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Violation of the Unfair Competition Law – Commission of Unlawful Business Act or Practice**
**Cal. Bus. & Prof. Code § 17200 *et seq*.**

110.    Plaintiff repeats, reasserts, and incorporates the allegations contained in paragraphs above as if set forth herein.

111.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

112.    The acts and practices of Defendants as alleged herein constitute "unlawful" business acts and practices in that Defendants' conduct violates the False Advertising Law.

113.    Defendants' conduct is further "unlawful" because it violates the California Insurance Code and its implementing regulations in the following ways:

      a.    Defendants' NRBP violates Cal. Ins. Code § 1861.05 in that it produces excessive and unfairly discriminatory rates.

      b.    Defendants' NRBP violates Cal. Code Regs. Tit. 10, § 2632.4(a) in that it constitutes a rating factor that is not set forth in or authorized by California regulations.

      c.    Defendants' NRBP violates Cal. Code Regs. Tit. 10, § 2632.4(b) in that it constitutes a rating factor that does not bear a substantial relationship to loss.

      d.    Defendants' NRBP violates Cal. Code Regs. Tit. 10, § 2632.10(a) in that it causes Allstate to collect a premium which is not calculated in accordance with a class plan that complies with California regulation.

      e.    Defendants' NRBP violates Cal. Ins. Code § 1859 in that Allstate willfully withheld information from, or knowingly gave false or misleading information to, the California Insurance Commissioner concerning its use of NRBP to unlawfully increase Plaintiff's and the Class' insurance premiums.

584527.4

114.    Plaintiff and the Class members have suffered injury in fact and have lost money as a result of Defendants' unlawful business acts or practices.

115.    Pursuant to Business and Professions Code §§ 17200 and 17203, Plaintiff seeks an order providing restitution and disgorgement of all profits relating to the above-described unfair business acts or practices, and injunctive and declaratory relief as may be appropriate.

## SECOND CAUSE OF ACTION
**Violation of the Unfair Competition Law – Commission of Unfair Business Act or Practice Cal. Bus. & Prof. Code § 17200 *et seq.***

116.    Plaintiff repeats, reasserts, and incorporates the allegations contained in paragraphs above as if set forth herein.

117.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

118.    The acts and practices of Defendants as alleged herein also constitute "unfair" business acts and practices under the UCL in that Defendants' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous.  Further, the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct.

119.    Defendants have, in the course of their business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by employing NRBP in their methodologies and policies to produce excessive and unfairly discriminatory rates.

120.    Defendants have also, in the course of their business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by:

    a.    Engaging in bad faith in using NRBP to determine auto insurance rates;

    b.    Not calculating auto insurance rates based on risk or loss costs but, instead, using NRBP to inflate rates based on price elasticity;

    c.    Making untrue and misleading statements about the manner in which they determine a customer's auto insurance rate;

    d.    Making material and misleading omissions about the manner in which they determine a customer's auto insurance rate;

584527.4

e.    Using NRBP in a manner that was not transparent, ascertainable, or verifiable by Plaintiff and Class members; and

f.    Unlawfully and unfairly using NRBP to extract additional revenues from their price inelastic customers, including but not limited to those who are or were most loyal by virtue of their tenure as insureds of Defendants.

121.    The above-described unfair business acts or practices present a threat and likelihood of harm and deception to members of the Class in that Defendants have systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

122.    Pursuant to Business and Professions Code §§ 17200 and 17203, Plaintiff seeks an order providing restitution and disgorgement of all profits relating to the above-described unfair business acts or practices, and injunctive and declaratory relief as may be appropriate.

### THIRD CAUSE OF ACTION
**Violation of the Unfair Competition Law – Commission of Fraudulent Business Act or Practice
Cal. Bus. & Prof. Code § 17200 *et seq.***

123.    Plaintiff repeats, reasserts, and incorporates the allegations contained in paragraphs above as if set forth herein.

124.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

125.    The acts and practices of Defendants as alleged herein constitute "fraudulent" business acts and practices under the UCL in that Defendants' conduct is false, misleading, and has a tendency to deceive the Class and the general public.

126.    Defendants' conduct in using NRBP to manipulate and inflate its auto insurance rates for its price inelastic customers was likely to deceive, and did in fact deceive, Plaintiff and the Class.

127.    Defendants' conduct in failing to disclose to Plaintiff and members of the Class Defendants' use of NRBP to manipulate and inflate auto insurance rates for price inelastic policyholders was likely to deceive, and did in fact deceive, Plaintiff and the Class.

128.   Defendants' conduct in misrepresenting to Plaintiff and members of the Class the methodology and manner in which their auto insurance rates are determined, including but not limited to the factors that are considered, was likely to deceive, and did in fact deceive, Plaintiff and the Class.

129.   Plaintiff and the Class members have suffered injury in fact and have lost money as a result of Defendants' fraudulent business acts or practices.

130.   The above-described fraudulent business acts or practices present a threat and likelihood of harm and deception to members of the Class in that Defendants have systematically perpetrated the fraudulent conduct upon members of the public by engaging in the conduct described herein.

131.   Pursuant to Business and Professions Code §§ 17200 and 17203 Plaintiff seeks an order providing restitution and disgorgement of all profits relating to the above-described fraudulent business acts or practices, and injunctive and declaratory relief as may be appropriate.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**

132.   Plaintiff repeats, reasserts, and incorporates the allegations contained in paragraphs above as if set forth herein.

133.   Defendants have been unjustly enriched at the expense of Plaintiff and Class members as a result of their conduct as alleged above.

134.   Defendants have wrongfully and unjustly collected higher auto insurance payments from thousands of insureds than were entitled to by employing hidden NRBP practices in their pricing methodologies.

135.   It would be inequitable to allow Defendants to retain these ill-gotten gains, and the Plaintiff and Class members are entitled to restitution and/or disgorgement of all revenues obtained by Defendants as a result of their unlawful conduct.

**FIFTH CAUSE OF ACTION**
**Violation of the False Advertising Law**
**Cal. Bus. & Prof. Code § 17500 *et seq.***

136.   Plaintiff repeats, reasserts, and incorporates the allegations contained in paragraphs above as if set forth herein.

20

137.    In violation of Cal. Bus. & Prof. Code § 17500 *et seq.*, the advertisements, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of Defendants' auto insurance policies.

138.    Defendants knew or reasonably should have known that their statements about the manner and methodology by which their auto insurance rates were determined were untrue and/or misleading.

139.    Specifically, the following statements on the Defendants' website are untrue and misleading and Defendants knew, or reasonably should have known, that they were untrue and/or misleading:

  a. "The quote you receive is impacted by the following factors:  Your driving record. Your past insurance claims history. Your vehicle type and value. Included safety features in your car, which could effectively limit the extent of bodily damage you suffer in an accident.  Included security features in your car, such as anti-theft alarms or devices, which are likely to have an impact on preventing your car from being stolen. Where you live, which could directly influence the safety of your car with respect to theft and certain natural disasters. How often you drive, which tells an insurance company how frequently your car is exposed to risk."

140.    As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

## SIXTH CAUSE OF ACTION
### Violation of Cal. Ins. Code § 1861.10

141.    Plaintiff repeats, reasserts, and incorporates the allegations contained in paragraphs above as if set forth herein.

142.    Cal. Ins. Code sec. 1861.10(a) authorizes "any person" to "initiate...any proceeding permitted . . . pursuant to" Chapter 9 of the Insurance Code, and to "enforce any provision of" Article 10 of Chapter 9 of the Insurance Code.

584527.4

143.   Plaintiff is a person initiating a proceeding permitted pursuant to Chapter 9 of the Insurance Code within the meaning of Section 1861.10(a) because Section 1861.03(a) of Chapter 9 of the Insurance Code makes the unfair business practices laws applicable to the business of insurance.

144.   Section 1861.05 of the Insurance Code prohibits rates that are excessive, inadequate, or unfairly discriminatory, and Section 1861.02(a)(4) of the Insurance Code prohibits the use of rating factors that do not have a substantial relationship to risk of loss.  Both Section 1861.05 and Section 1861.02(a)(4) are provisions of Article 10 of Chapter 9 of the Insurance Code.  Plaintiff is a person seeking to enforce those provisions within the meaning of Section 1861.10(a).

145.   Defendants have been charging and continue to charge excessive and unfairly discriminatory rates through their use of NRBP as alleged herein in violation of Section 1861.05 and Section 1861.02(a)(4).

146.   Plaintiff and the Class members have suffered injury in fact and have lost money as a result of Defendants' charging of excessive and unfairly discriminatory rates through their use of NRBP in violation of Sections 1861.05 and 1861.02(a)(4).

147.   Pursuant to Insurance Code Section 1861.10(a) and (b), Plaintiff seeks an order providing restitution and disgorgement of all profits resulting from Defendants' charging of excessive and unfairly discriminatory rates through the use of NRBP, injunctive and declaratory relief as may be appropriate, and attorneys' fees and expenses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for judgment in favor of Plaintiff and the Class and against Defendants as follows:

A.   Finding that this action satisfies the prerequisites for maintenance as a class action under California Code of Civil Procedure Section 382 and certifying the Class defined herein;

B.   Designating Plaintiff as a representative of the Class and her counsel as class counsel;

C.   Declaring Defendants' NRBP policies and practices to be unlawful and granting equitable and/or injunctive relief;

D.   Awarding Plaintiff and members of the Class their compensatory damages in an amount to be determined at trial;

22

584527.4

1        E.        Disgorgement of, restitution of, and/or imposing a constructive trust upon, the ill-gotten

2   gains derived by Defendants from their unjust enrichment;

3        F.        Plaintiff's reasonable attorneys' fees and non-taxable expenses;

4        G.        Plaintiff's taxable costs;

5        H.        Pre- and post-judgment interest at the maximum rate permitted by applicable law; and

6        I.        Granting such further relief as the Court deems just.

7

## JURY DEMAND

8      Plaintiff demands a trial by jury on all issues so triable.

9   Dated: August 20, 2015          Respectfully submitted,

10                       GOLDSTEIN, BORGEN, DARDARIAN & HO

11

12                       David Borgen

13                       Shanon Carson (PA Bar 85957)

14                       Peter Kahana (PA Bar 33587)
                            Jeff Osterwise (PA Bar 201589)

15                       BERGER & MONTAGUE, P.C.
                            1622 Locust Street

16                       Philadelphia, PA  19103
                            Tel:  (215) 875-3000

17                       Fax: (215) 875-4613

18                       Jonathan K. Tycko (D.C. Bar 45851)
                            Andrea R. Gold (D.C. Bar 502607)

19                       TYCKO & ZAVAREEI LLP
                            2000 L Street NW, Suite 808

20                       Washington, DC 20036
                            Tel:  (202) 973-0900

21                       Fax: (202) 973-0950

22                       Attorneys for Plaintiff

23

24

25

26

27

28

23

584527.4



EARNIX

Integrated Pricing & Customer Analytics



# Price Optimization in North America:
## Myth vs. Reality

**SEPTEMBER 2012**



## Background

US airlines were early adopters of price optimization who over thirty years ago started experimenting with the concept of revenue management. Their success led to the rise of new pricing strategies in many industries including automotive, retail, telecommunications, manufacturing, and financial services.

In the last decade, the opportunities for pricing optimization have become more widespread; a result of the rise of e-commerce and the vast amounts of newly available customer behavior data that comes with it.

The use of price optimization strategies for personal lines insurance started out over a decade ago in Europe and is currently making rapid headway in North America as well.

Insurance price optimization combines the best of each of the three traditional pricing approaches (cost plus, value-based, and market-based). It incorporates data related to direct operating costs, consumer behavior, and the competitive environment to determine the best pricing strategy in order to achieve specific business goals.

The financial benefits of price optimization can be significant. Companies that adopt optimization as a pricing strategy can realize improvement of 1-4 points in the combined ratio and/or as much as a 10-20% increase in new business conversion rates.

As we talk with companies in North America about price optimization, it is clear that many have misconceptions about the strategy. Based on our daily interactions with North American insurers, we can shed light on these misconceptions and provide greater clarity on how price optimization is used by North American insurers.



### Myth #1: The regulatory environment prohibits the use of price optimization

The most common misconception about price optimization is that it violates regulations. Our experience working with US and Canadian insurers shows that is not the case. Moreover, the filing process is typically identical whether a company utilizes price optimization or not.

*Our experience shows that improvements in business performance will be achieved even in highly-regulated markets.*

When rates are optimized in a given state or province, it is up to the company to determine which rating variables are optimized and the extent to which rates can be adjusted from loss cost or expense estimates. Most of the time, the changes introduced by price optimization tend to be small. These small changes, typically in the range of +/- 2-3%, can have a big effect on the financial outcomes of one's book when applied across a large number of variables, but in most cases have no regulatory implications.

### Myth #2: There is no financial benefit from price optimization in highly-regulated markets

Another common misconception is that there is little financial benefit of price optimization in highly-regulated markets. While greater benefits can be achieved when pricing decisions are not constrained by a rating algorithm or tight regulations, our experience working with insurers across all regulatory environments shows that improvements in the combined ratio and/or new business conversion will be achieved, even in highly-regulated markets. Of note, such improvements are greater when the constraints (regulatory and others) are tightly integrated into the optimization process, allowing the organization to find with confidence the best case scenarios within the boundaries of compliance.



### Myth #3: Robust demand models cannot be built without price testing

Key to any price optimization strategy is the understanding of how customers respond to price changes. Price testing is a common practice for measuring the effect of rate changes in places with limited rate regulation, such as most European markets. In the UK, for example, companies can randomly change prices for a small portion of their book and observe the effect of these rates changes on the behavior of consumers in the test group. In the US and certain Canadian provinces, insurers are not allowed to do price testing. That does not mean, however, that insurers cannot build robust demand models to estimate the effect of rate changes.

*As few as fifty to a hundred thousand observations can provide a large enough sample for effective customer demand models.*

Most companies have historical data that can be used to measure reaction to rate changes by both existing and prospective customers (i.e. did they accept the offer or reject it) at different points of time. Analysis of the differences in conversion rates demonstrated in prior rate changes can generally provide enough data to construct robust price demand models that can be used for rate optimization.

### Myth #4: Companies need huge numbers of observations to build robust demand models

While the common practice in the industry is to use a large number of observations over a few years to build robust loss cost models, our worldwide experience shows that in most cases as few as fifty to a hundred thousand observations provide a data sample large enough to construct effective models of consumer demand. This is good news for smaller companies that don't have enormous books as they can still enjoy the benefits of price optimization. These models can be built on a countrywide basis while including state specific variables to capture any differences among the states.

A related myth is that companies must have perfect data, and particularly perfect competitor data, in order to optimize their own rates. Although competitor data can be helpful (especially for new business models), companies can build effective models of consumer demand without it. As previously described, it is possible to build a robust pricing optimization model based on observations from prior price changes. Naturally if a company has competitor data and is confident in its accuracy, the model's robustness can be improved with this information.

4



### Myth #5: Customer demand does not change over time

The reality is that customer behavior does change over time, and so do measures of customer demand. Reasons for changes in measures of customer price elasticity or customer behavior can be macro-economic trends, media influence, and the emergence of new communication modalities. If such changes are not constantly monitored and incorporated into the pricing models, a carrier could be late in reacting to market dynamics and fall behind the competition.

*A substantially higher lift can be achieved by optimizing at the individual state and factor level.*

Insurance companies should understand that price optimization is not a one-time event but a routine part of doing business. Companies implementing pricing optimization need to establish repeatable processes that allow them to monitor when results deviate from expectations, discover what caused these deviations, and modify their models and pricing strategies in responses to changes in consumer behavior.

### Myth #6: Consumer demand is best incorporated in high level product design, not at the individual state and factor level

Changing product design based on knowledge of customer behavior is valuable and important, as it will likely produce positive financial outcomes. However, limiting the changes only to high level product design is financially inefficient. Companies can get a substantially higher lift by optimizing at the individual state and factor level as well, resulting in 1-4 point improvement in the combined ratio or 10-20% improvement in new business conversion. Most notably, optimization can address the differences in behavior between new business and renewal customers, while adhering to all regulatory requirements.

It is also important to note that there is no need to change the product design or introduce new rating variables to reap the benefits from pricing optimization. Rather, one can perform the optimization under the current rate order. At the same time, optimization can certainly be used for an effective introduction of new rating variables or an evaluation of changes to product design.



### Myth #7: It is too cumbersome and time-consuming to optimize at the factor level

This myth is rooted in the difficulties companies have experienced attempting to optimize rating factors by reverse-engineering after solving for the direct price. This method is indeed extremely time-consuming, and can only be executed by specialists, keeping the business managers from taking an active role in the process. Newer technologies that enable direct rating factor optimization remove much of the complexity from the process, allowing business users to directly optimize prices at the factor level and thus enabling cross-team collaboration.

*Newer technologies that enable rating factor optimization remove much of the complexity from the process.*

### Myth #8: Optimization is an all or nothing proposition

While we believe the financial benefits will ultimately drive companies towards business-wide adoption of price optimization, most insurers deploy optimization in a stepwise fashion. Typically, companies start with a pilot project, one offering (typically auto) and one state, which provides a realistic measure of the benefits that can be realized as well as a good sense of the effort required. Following the pilot and verification of results through a field test, a rollout strategy is then developed and implemented.

When thinking about the best place to start, companies should look for a market that is large enough to provide credible results. It is also preferable to choose a market that is relatively stable, which allows the company to better isolate the effect of price optimization as opposed to other market factors. Last but by no means least, it is important to start with a management team that is open to change and is excited for the opportunity to improve the existing process and business outcomes.

6



## Conclusion

Despite common misconceptions, price optimization is being tested and adopted as a pricing strategy in North America at a very rapid pace.

The adoption trends are analogous in many ways to the introduction of credit scoring in auto pricing. At first, most companies were skeptical. Those that were early to adopt the use of credit scoring gained a competitive advantage, and late adopters were hurt because of adverse selection. Within a few years, virtually every insurer was using credit information. We are seeing a similar trajectory in price optimization today.

Companies that are not focused on obtaining a better understanding of consumer behavior and incorporating this knowledge into their rate-setting process will be at a substantial competitive disadvantage.

## About Earnix

Earnix Integrated Pricing and Customer Analytics™ software empowers financial services companies to predict customer demand and its impact on business performance, enabling the alignment of pricing and products with changing market dynamics. Earnix combines risk and demand modeling with real-time connectivity to core operational systems, bringing the power of analytic-driven decisions to every customer interaction in any regulatory environment. Leading banks and insurance companies rely on Earnix solutions to optimize the prices of deposits, loans, and policies, delivering greater value to customers and higher returns to shareholders.

## Disclaimer and Trademark Notices

This report is provided by Earnix Ltd. ("Earnix"). Earnix and other Earnix products and services mentioned herein as well as their respective logos are trademarks or registered trademarks of Earnix in Israel and in several other countries. All other product and service names mentioned are the trademarks of their respective companies.

### DISCLAIMER OF WARRANTY

Earnrepresentation or warranties, either express or implied by or with respect to anything in this document, and shall not be liable for any implied warranties of merchantability or fitness for a particular purpose or for any indirect special or consequential damages.

### COPYRIGHT NOTICE

No part of this publication may be reproduced, stored in a retrieval system or transmitted, in any form or by any means, photocopying, recording or otherwise, without prior written consent of Earnix. No patent liability is assumed with respect to the use of the information contained herein. While every precaution has been taken in the preparation of this publication, Earnix assumes no responsibility for errors or omissions. This publication is subject to change without notice.

Copyright © Earnix. All rights reserved.



**US Headquarters**

Earnix Inc.
Rockefeller Center 7th Floor
1230 Avenue of the Americas
New York, NY 10020
Tel. +1-646-756-2840

Copyright 2012 Earnix Ltd. All rights reserved



# INSURANCE PRICING
# AND
# CUSTOMER VALUE OPTIMIZATION



# ONE-STOP SOLUTION FOR
# INSURANCE PRICING AND CUSTOMER VALUE OPTIMIZATION

Earnix provides an integrated suite of software solutions that enable insurers to optimize pricing and maximize customer value across auto, home, commercial, and other product lines.

Used by leading insurers worldwide, Earnix solutions deliver proven and measurable bottom-line results year after year.



End-to-End Closed-Loop
Pricing Process

## A Single Platform for the Entire Pricing Process

Earnix is a one-stop solution that simplifies the entire pricing process, helping insurers increase business agility by overcoming the constraints of existing legacy systems, removing the need for extensive IT support, and accelerating time-to-market of new products and prices.

## Industry-Leading Risk Cost Modeling

Earnix Risk Premium Module (RPM) provides state-of-the-art statistical tools that empower actuaries and analysts to generate the most accurate and robust risk pricing models. Built-in visualization capabilities make it easy to analyze these models for selection of the best pricing strategy.

## Price Optimization: Elevating Profit and Growth

Earnix best-in-class analytics and patent-awarded optimization technology empower insurers to implement pricing strategies that go beyond the traditional risk cost pricing, incorporating demand elasticity models to maximize profit and growth objectives.

## Cloud-Ready Enterprise Architecture

Whether deployed on premise or in the cloud, Earnix can churn millions of pricing transactions per day, either in batch or real-time environment. It is also easily integrated with existing enterprise systems, delivering the power of optimization in a seamless fashion to every point of customer interaction through all distribution channels.



## A Modular Solution that Allows You to Think Big, Yet Start Small

Earnix provides a comprehensive pricing platform that empowers insurers to transform their pricing processes from A to Z.

Rather than a "big bang" approach which can be disruptive to the business, the modular architecture of Earnix and flexible deployment options on premise and in the cloud allow you to quickly get started and grow the solution footprint over time.



**End-to-End Pricing Platform**

### Earnix Modules

❖ Risk Premium
❖ Price Optimization
❖ Real-time Price Optimization
❖ Rating Factor Optimization
❖ Pricing Management
❖ Executive Dashboard
❖ Geo-analytics

# EARNIX

## Proven Solution, Proven Results

Using the Earnix solutions, insurers worldwide are able to achieve measurable business results that include:

- ✚ Boosting profitability by up to 5% of Gross Written Premium – translating into over 10% increase to the bottom line
- ✚ Higher customer lifetime value
- ✚ Increasing customer acquisition rate
- ✚ Improving customer retention
- ✚ Optimizing the customer mix
- ✚ Accelerating time-to-market of new offers and prices

### Sample Customer Results

| Company Profile | Business Challenges | Results Delivered by Earnix Solutions |
|---|---|---|
| Global Personal Lines Insurer | Address a rapidly softening market and aggressive pricing strategies of competitors leading to a 10% drop in market prices | Increased retention rates while increasing profits by of 3.5% of Gross Written Premium (GWP) |
| National Car Insurer | Increase profitability of renewals while maintaining volume of existing policies in a strictly regulated environment | Profit increase of 2.8% of Gross Written Premium (GWP) while complying with regulatory requirements |
| UK Insurance Broker | Achieve higher growth and profitability in a highly competitive market | Profit increase of 3% of Gross Written Premium (GWP) within the first year of implementation; 10% increase in earnings per customer |
| European Direct Insurer | Respond to competitive pressure resulting in increased discounting and reduced profitability. | 25% reduction in discounted premiums while maintaining customer retention goals in an increasingly competitive market |
| UK Bancassurer | Reduce attrition rates and mid-term cancellations | Maintained retention rates while increasing profits by of 2.1% of Gross Written Premium (GWP) |
| US Insurer | Grow profitability of a large multi-state auto book in highly regulated markets | Increased profits by 1.8% of GWP while maintaining retention; enabling top management with better understanding of pricing alternatives |
| European Insurer | Grow the company book amid a softening market, while optimizing customer Lifetime Value | Grew book by 10% over 3 years, while growing profits by 1.5% of GWP |
| EMEA Direct Insurer | Increase cross-sale rates from auto to home policies | Increased cross-sale success rate by 30% |



EARNIX

INSURANCE PRICING AND CUSTOMER
VALUE OPTIMIZATION

# RISK PREMIUM MODELING



# RISK PREMIUM MODELING

Model Risk.
Predict Results.
Evaluate Alternatives.
Faster. Easier.
More Accurately.

## Better Understand Risk

Earnix Risk Premium Module (RPM) provides state-of-the-art statistical tools that enable actuaries and analysts to build accurate and robust risk pricing models. Built-in visualization capabilities make it easy to analyze and compare these models for selection of the best pricing strategy.

## Simulate Results

Earnix RPM allows you to easily simulate changes to existing tariffs and rating tables and conduct what-if analysis to predict the results of new pricing strategies.

## Combine Risk and Behavior Analysis

Earnix RPM is designed to work in tandem with Earnix Optimizer, providing insurers with a combined risk and behavioral profile for a 360-degree view of the customer.

## Make it Easier

The Earnix user interface provides a single point of access to all the functionality you need so you can quickly and intuitively build your models, evaluate results, and optimize your pricing decisions all in one place.

## How is Earnix Risk Premium Module Different?

### The Most Powerful Tools of the Trade

Generalized Linear Modeling (GLM), Generalized Additive Models (GAM) based on Smoothing Splines, and Regression Trees make actuarial work more accurate, faster, and easier.

### Easy to Use and Visualize

Intuitive user interface enables data analysis with minimal hassle. A wide range of charts with drill-down options help analyze and compare models.

### Integrates with Your Pricing Process

Built-in pricing execution capabilities and Service Oriented Architecture that enables easy integration with existing systems make Earnix RPM a vital component of your end-to-end pricing process.

### A Collaborative Tool for Your Team

Unlike desktop-based tools, Earnix provides a multi-user solution that empowers you to effortlessly collaborate with your team.

### Scales to Meet Your Needs

Configurable server architecture supports parallel processing on several CPUs to provide fast and reliable results.



EARNIX

RISK PREMIUM
MODELING



# Risk Premium Analysis and Pricing Made Easy

### Simplified Data Preparation
Prepare data for modeling using rich and flexible data manipulation tools with advanced graphing. Easy import/export data to/from your data store or statistics application (e.g. SAS).

### Advanced Smoothing Spline Regression
Fit splines using advanced cross-validation techniques to model non-linear and geographic relationships with faster and more accurate modeling.

### Effortless Model Comparison
Quickly zero-in on your best options using intuitive numerical and graphical indicators to easily compare models.

### Flexible Rating Structures
Translate model output into rating tables with a push of a button to promptly create even the most complex rating structures.

### Powerful Visualization and Graphing
Analyze models with easy-to-use graphic outputs and drill-down capabilities. Use your corporate business intelligence tools to create additional customized graphs and reports based on Earnix RPM data.



### Integrated Geo-Analytics
Add the geographic dimension to your risk premium modeling with spatial data embedded in your loss-cost analytics. The integrated state-of-the-art mapping interface enhances the accuracy of your analysis and simplifies the communication of its results.



EARNIX

RISK PREMIUM
MODELING

# PRICE
# OPTIMIZATION



EARNIX

INSURANCE PRICING AND CUSTOMER VALUE OPTIMIZATION

# PRICE OPTIMIZATION

Auto. Home. Commercial. Other Insurance Lines.

## Why Optimize?

In today's competitive insurance market, traditional ratemaking based on risk and cost alone is no longer sufficient.

The answer to the needs of insurers in the customer-driven age is incorporating demand and risk cost considerations to optimize pricing and customer value.

Earnix Optimizer enables insurers to optimize pricing decisions, maximize customer lifetime value, and ultimately meet and exceed growth and profitability goals.

## Optimize Pricing Decisions, Maximize Customer Value

✤ Offer each customer the right products and prices to maximize customer lifetime value

✤ Transform the vision of customer-centricity into a set of actions and processes

✤ Better meet customer needs to outpace the competition with higher profitability and growth

## Improve Retention & Renewals, Generate New Business

✤ Target the optimal customer mix to match your growth and profit objectives

✤ Attract profitable new business with best-fit products and prices tailored to each customer

✤ Protect your existing customer base while preventing profit erosion with optimized renewal offers

## Ensure Regulatory Compliance

✤ Define prices and policies that maximize business results while maintaining regulatory compliance

✤ Optimize rating factors used in regulated pricing formulas to increase customer value within regulatory guidelines



# How Does It Work?

## The Power of Optimization at the Fingertips of Every Business User

Using a patent-winning methodology and technology, Earnix brings a scientific approach to customer value and pricing optimization.

## You Are in Control

Unlike black box optimization solutions, Earnix puts your actuaries and pricing managers in control of the parameters that drive pricing goals and strategies, eliminating long-term reliance on external resources.

Keeping the enormous complexity involved in the underlying computation well under the hood, Earnix Optimizer features a simple user interface that provides business users across the organization with unparalleled access to the power of optimization.



## Under the Hood

Optimizing rates for millions of customers is not a trivial task to say the least. Each potential price point requires an understanding of numerous variables, how they are impacted by your constraints, and how they affect the results. Put together, it is easy to see how each pricing decision requires the comparison of a vast set of alternatives. It is the sophistication of the algorithms that allows Earnix Optimizer to perform these massive calculations and compare all relevant permutations with the speed and accuracy that empower your team to keep pace with the demands of your market.

# EARNIX

PRICE OPTIMIZATION

# What can you do with Earnix Optimizer?

❖ **Set your optimization goals** to reflect your business performance objectives: increasing retention, market share and gross written premium, maximizing profit margins, or any combination of these goals

❖ **Analyze the price elasticity** of each customer profile and uncover the **efficient pricing frontier for each product in your portfolio**



❖ **Conduct "what if" scenarios** to compare how different rate proposals will affect written premiums, loss ratios, and other KPIs

❖ **Simulate changes** to market conditions, risk characteristics, and competitor pricing to predict the impact on your business and preempt the competition

❖ **Optimize rates** subject to a broad and dynamic set of regulatory and business constraints

❖ **Maximize Customer Lifetime Value** using Earnix patented methodology and technology

❖ **Monitor and adjust your pricing strategies** based on real results from the field so you are never out of touch with the market



PRICE
OPTIMIZATION

# REAL-TIME
# PRICE OPTIMIZATION



EARNIX
INSURANCE PRICING AND CUSTOMER VALUE OPTIMIZATION

# REAL-TIME PRICE OPTIMIZATION

Real-time Price Optimization enables insurers and intermediaries to step up to the requirements of the competitive and rapidly expanding online insurance market-place.

Earnix Optimizer serves as a real-time engine that delivers instant optimized price quotations directly to the point of customer interaction via the Internet, call center, or any proprietary system.

## Millions of Quotations per Day, Optimized

Built to scale up to the most demanding online environment, Earnix Optimizer is capable of optimizing millions of quotations daily without compromising on the powerful capabilities supported in batch optimization.

## Instant Response, Personalized to Each Customer

When shoppers are ready to buy, they have little tolerance to incomplete information or mismatched offers. With Real-time Price Optimization, insurers can instantaneously issue online offers and price quotations that are optimized for each customer based on their risk and behavioral profiles.

## Keeping Your Finger on the Pulse of the Market

Earnix Optimizer continuously allows you to analyzes customer acceptance of price quotations issued, so you can utilize this constant stream of real-timefeedback data to promptly recalibrate your pricing strategies in and response adjust to market dynamics.



EARNIX

REAL-TIME
PRICE OPTIMIZATION

# RATING FACTOR OPTIMIZATION



EARNIX

INSURANCE PRICING AND CUSTOMER VALUE OPTIMIZATION

# RATING FACTOR OPTIMIZATION

In markets where regulation require prices to follow a rating factor structure, the Earnix Rating Factor Optimization module allows insurers to optimize prices offered to customers while maintaining regulatory compliance.

While some insurers have attempted to optimize regulated prices by reverse-engineering rating factors, this approach has proven to be extremely time-consuming and failed to deliver the expected results.

In contrast, **Earnix directly optimizes the rating factors**, providing your team with new factors that can be uploaded into your existing table structure.



| Current premium = Base premium | Age | Factor | | Gender | Factor | | Car Age | Factor |
|---|---|---|---|---|---|---|---|---|
| | <21 | 2.2 | | Male | 1.2 | | <1 | 2.7 |
| | 21–35 | 2.4 | | Female | 1 | | 1–2 | 1.8 |
| | 35–49 | 0.7 | | | | | 2–4 | 1 |
| | 50–59 | 0.8 | | | | | 4–7 | 0.8 |
| | 60+ | 0.7 | | | | | 7+ | 0.5 |

 **EARNIX OPTIMIZER** 

| Current premium = Base premium | Age | Optimized Factor | | Gender | Optimized Factor | | Car Age | Optimized Factor |
|---|---|---|---|---|---|---|---|---|
| | <21 | | | Male | 1.2 | | <1 | 2.7 |
| | 21–35 | | | Female | | | 1–2 | 1.8 |
| | 35–49 | | | | | | 2–4 | |
| | 50–59 | 0.8 | | | | | 4–7 | |
| | 60+ | 0.7 | | | | | 7+ | |

# PRICING
# MANAGEMENT



INSURANCE PRICING AND CUSTOMER VALUE OPTIMIZATION

# PRICING MANAGEMENT

Control.
Automate.
Collaborate.

The Earnix Price Execution module streamlines the entire price lifecycle management, compressing the lag time for rolling out new prices from months to days.

## Put Your Pricing Team in Control

Earnix provides your team with a centralized point of control over all the steps involved from the decision on a new pricing strategy to the availability of new prices in the field:

- ❖ Developing of new pricing strategies and the resulting premiums
- ❖ Testing of the new pricing configuration for any errors and regulatory compliance
- ❖ Deployment of the new prices to the production environment

## Automate Processes, Minimize IT Resource Requirements

The Earnix Price Execution module automates the management and transition of pricing versions through the analytical, testing, and production environments, eliminating manual processes that required heavy involvement of an often time-strapped IT support team.

- ❖ Automated testing and verification of new pricing strategies according to user-defined criteria
- ❖ Automated activation of new prices based on user-defined approval rules and authorities
- ❖ Automated real-time notifications that keep all stakeholders informed when new prices are tested and rolled out to the field

## Collaborate Across Functions

Using the Price Execution module, all stakeholders can closely collaborate in the pricing decision and approval process. To enable users across the organization utilize the system in a secured fashion, Earnix provides robust access control at the product, project, and modeling levels, as well as a complete audit trail of all price testing and deployment events.

**Collaboration** — Actuaries... R&D Team... Pricing Team... Product/State Managers...

Develop new prices → Test → Approve → Deploy →

Audit Trail



# ARCHITECTURE, DEPLOYMENT AND INTEGRATION



EARNIX

INSURANCE PRICING AND CUSTOMER VALUE OPTIMIZATION

# SOLUTION ARCHITECTURE

Earnix Optimizer is a packaged enterprise software product used by many of the leading insurers and banks worldwide. The product is regularly enhanced and updated according to a roadmap created with constant customer input, allowing your organization to keep up with the latest pricing management and optimization technology while containing your Total Cost of Ownership (TCO). Earnix typically releases one new version each year, with cumulative patch releases available at shorter intervals.



## The Earnix Enterprise Platform

The Earnix Optimizer platform provides an analytical application used by pricing and product professionals, as well as an optimization engine that delivers real-time price recommendations to your existing pricing and customer-facing applications.



# Deploying Earnix in Your Organization

Earnix Optimizer deployment typically consists of three identical instances of the software.

## I. Analytical

The Analytical environment provides actuaries, pricing experts, as well as product and territory managers with the tools they need to import data sets extracted from operational systems; create predictive statistical models; optimize prices; and monitor actual results against prior predictions.

## II. Staging (pre-production testing)

The Staging environment is used as a pre-production area in which new models being released by the pricing team undergo final testing prior to going live. Earnix provides advanced testing capabilities allowing you to load the server with simulated pricing requests and automatically verify the results according to your predefined criteria.

## III. Real-time (optional)

The Real-time environment delivers optimized prices to your existing operational systems such as consumer self-service Internet portals, call center and CRM applications, and Policy Renewals systems.

## Industry Standard, Simple to Integrate

Earnix Optimizer is 100% J2EE compliant, using IBM WebSphere Application Server with either a DB2 or Oracle database. Supported server operating systems include all recent versions of IBM AIX, Linux, and MS Windows. Client applications are written with WebSphere Application Client software tools and can run on Windows XP, Vista, or Windows 7 PCs. Integrating Earnix Optimizer into your SOA environment is a simple matter via industry-standard SOAP web services (XML requests) or a published RMI/IIOP interface.

## Scalable to Meet Your Growing Needs

Earnix Optimizer's configurable server architecture enables the processing of multiple threads of business logic on several CPUs in parallel, installed on one or more physical or virtual server machines. The result is a highly scalable solution that delivers millions of optimized price quotes per day in live production environments around the world.



EARNIX

ARCHITECTURE, DEPLOYMENT AND INTEGRATION

# Cloud-based Option: On-Demand Pricing Power

Utilizing the Earnix cloud solution, you can quickly bypass any IT infrastructure limitations to instantly make the solution available to your pricing teams across the organization.

## Quick Deployment with Minimal IT Resources

With no servers to deploy in your data centers, your Earnix solution can be up and running in no time, even when your IT resources are maxed out with their day-to-day tasks.

## Cost-effective Computing Power Scalability

Using the elastic cloud infrastructure, you only pay for the computing power you need, making more computing resources available as you expand the use of Earnix Optimizer.

## On-demand Rollout and Instant Access to Pricing Analytics across Products, Territories, Departments

Rolling out the solution to additional users and departments becomes a matter of decision, as authorized users anywhere in the world are capable of accessing Earnix Optimizer any time from directly from their workstationcan access Earnix Optimizer anytime directly from their workstations.

## Closer Collaboration with Earnix and Partner Pricing Experts

Hosting your solution in the cloud allows the optimization experts from Earnix or the partner organization you are working with to easily access the system and lend a hand when needed.



User Workstation

Cloud firewall

Earnix Client
[Terminal Server]

Earnix Application Server

Cloud

Database

Database Backup

# EARNIX

# WORKING WITH EARNIX

Earnix was founded by insurance executives who sought a practical solution to the limitations of traditional pricing methods used by financial services providers. Joining forces with experts in statistics, econometrics, and optimization technology, they formed Earnix to help insurers improve performance through better customer segmentation, advanced demand analysis, and customer value optimization.

Following a proven methodology, the Earnix team will work with your organization to ensure a successful implementation that will have lasting impact on your business. The Earnix platform is open and easy to work with, so you can utilize both internal and third party resources for parts or even the entire implementation process. The Earnix team is available to assist as needed, from playing a supporting role to your team to providing complete implementation services for a turnkey solution.

## Data Preparation
Working with your team, we will help you get your data ready to support the demand analysis and price optimization functions within Earnix Optimizer.

## Demand Modeling
Using the available data, we will help your team use Earnix Optimizer's advanced analytical capabilities to establish the appropriate customer demand models and start optimizing your prices.

## Deployment and Integration
Earnix can help you fine-tune your pricing strategies, set them up for your day-to-day use, and integrate Earnix Optimizer with your operational IT systems.

## Training
While the software is easy-to-use, we will train your staff and provide system documentation to ensure you maximize the value of the solution.

## Support
To ensure your business continues to maximize the benefits from Earnix Optimizer, we are committed to providing ongoing technical support and business process assistance.

## Our Partners
In addition to the services offered directly by Earnix, we partner with leading consulting and technology firms to offer additional options for supporting the implementation of the Earnix solution in your organization.



FOR MORE INFORMATION
# WWW.EARNIX.COM

# EARNIX



Rating Factor Optimization

Download Brochure

| Current premium = Base premium | + | Age | Factor |
|---|---|---|---|
| | | <21 | 2.2 |
| | | 21-35 | 2.4 |
| | | 35-49 | 0.7 |
| | | 50-59 | 0.8 |
| | | 60+ | 0.7 |

| + | Gender | Factor |
|---|---|---|
| | Male | 1.2 |
| | Female | 1 |

| + | Car Age | Factor |
|---|---|---|
| | <1 | 2.7 |
| | 1-2 | 1.8 |
| | 2-4 | 1 |
| | 4-7 | 0.8 |
| | 7+ | 0.5 |

**EARNIX OPTIMIZER**

| Current premium = Base premium | + | Age | Optimized Factor |
|---|---|---|---|
| | | <21 | |
| | | 21-35 | |
| | | 35-49 | |
| | | 50-59 | 0.8 |
| | | 60+ | 0.7 |

| + | Gender | Optimized Factor |
|---|---|---|
| | Male | 1.2 |
| | Female | |

| + | Car Age | Optimized Factor |
|---|---|---|
| | <1 | 2.7 |
| | 1-2 | 1.8 |
| | 2-4 | |
| | 4-7 | |
| | 7+ | |

factor_optimization                                                close

# EXHIBIT B

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| James Kan, 240749<br>Goldstein Borgen Dardarian & Ho<br>300 Lakeside Drive Suite 1000<br>Oakland, CA 94612-3536<br>TELEPHONE NO.: (510) 763-9800<br>ATTORNEY FOR *(Name):* Plaintiff | **FILED**<br>OCT 05 2015<br>STEPHEN H. NASH CLERK OF THE COURT<br>SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>COUNTY OF CONTRA COSTA<br>By _____, Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF | |
|---|---|
| Superior Court of California, Contra Costa County<br>725 Court Street, P.O. Box 911<br>Martinez, CA 94553-1233 | |

| PLAINTIFF/PETITIONER: Andrea Stevenson | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Allstate Insurance Co., et al. | C15-01516 |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>Allstate |
|---|---|

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:   Summons, Civil Case Cover Sheet, Notice of Assignment to Defendant Seventeen for Case Management Determination, Class Action Complaint, Notice to Plaintiffs, Notice to Defendants, ADR Information, Notice Re Unavailability of Reporting Services, Discovery Facilitator Program

**By Fax**

3. a. Party served:  Allstate Insurance Co.

   b. Person Served: CT Corporation System-Kerstin Edralin - Person authorized to accept service of process

4. Address where the party was served:  818 West Seventh Street 930
   Los Angeles, CA 90017

5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 9/21/2015    (2) at (time): 2:25 PM

6. The "Notice to the Person Served" (on the summons) was completed as follows:

   d. on behalf of:

   Allstate Insurance Co.

   under:    CCP 416.10 (corporation)

7. **Person who served papers**
   a. Name:     Jimmy Lizama
   b. Address:    One Legal - 194-Marin
               504 Redwood Blvd #223
               Novato, CA 94947

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 37.95
   e I am:
     (3) registered California process server.
        (i)  Employee or independent contractor.
        (ii)  Registration No.: 4553
        (iii) County: LOS ANGELES

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.
Date: 9/22/2015

Jimmy Lizama
(NAME OF PERSON WHO SERVED PAPERS)            (SIGNATURE)

| Form Adopted for Mandatory Use<br>Judicial Council of California POS-010<br>[Rev. Jan 1. 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

OL# 7399460

# EXHIBIT C

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

ALLSTATE INSURANCE CO., and ALLSTATE INDEMNITY CO.,

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

ANDREA STEVENSON



FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

2015 AUG 21   A 10: 4?

STEPHEN _____
CLERK OF THE SUPERIOR COU__
COUNTY OF CONTRA COSTA, CA
BY_____
DEPUTY C____

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

---

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Contra Costa Superior Court | CASE NUMBER:<br>*(Número del Caso):*  **5 - 01516** |

725 Court Street
Martinez CA 94553

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
David Borgen & James Kan 300 Lakeside Dr., Suite 1000, Oakland, CA 94612 510763-9800

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)*  AUG 2 1 2015 | Clerk, by<br>*(Secretario)* | D. WEBER | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

SUPERIOR COURT - MARTINEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA  94553

STEVENSON VS. ALLSTATE

MSC15-01516

NOTICE OF ASSIGNMENT TO DEPARTMENT SEVENTEEN FOR CASE
MANAGEMENT DETERMINATION

THIS FORM, A COPY OF THE NOTICE TO PLAINTIFFS, THE ADR INFORMATION
SHEET, AND A BLANK CASE MANAGEMENT STATEMENT ARE TO BE SERVED
UPON ALL OPPOSING PARTIES, ALL PARTIES SERVED WITH SUMMONS AND
COMPLAINT/CROSS-COMPLAINT.

1. This matter has been assigned to Department 17, Judge B. Goode
presiding, for all purposes; Department 17 is designated as the
complex litigation department of the Court and as such (a) hears all
cases wherein a designation of complex case has been made and (b)
conducts hearings, in cases that this court determines, on a pre-
liminary basis may be complex, to determine whether the case should
remain in the complex litigation program.

2. All counsel are required to appear in Dept. 17 on 10/23/15
   at 8:30 a.m.
      (a) If the case has been designated as complex, and no counter-
          designation has been filed, the Court will hold its first
          case management conference at that time.
      (b) If the case has been assigned to Department 17 on a
          preliminary basis the Court will hold a hearing to determine
          if the matter is, or is not, complex.  If the matter is
          determined to be complex, the Court will then proceed with
          the first case management conference.

3. Each party shall file and serve a Case Management Conference
Statement five (5) days before this hearing and be prepared to
participate effectively in the Conference, including being thoroughly
familiar with the case and able to discuss the suitability of the case
for private mediation, arbitration or the use of a special master or
referee.

4. Prior to the conference counsel for plaintiff shall meet and confer
with counsel for each other party in an effort to precisely define the
the issues in the case, discuss the possiblity of early mediation, the
identities of possible other parties, and their respective plans for
discovery.

5. Until the time of the conference the following INTERIM ORDERS shall
be in effect:

   A. Plaintiff shall diligently proceed in locating and serving each
      and every defendant.  It is the Court's intention that each party
      be served in sufficient time to have entered an appearance within
      the time allowed by law and to attend the first conference.
   B. All discovery shall be stayed excepting as all parties to the
      action might otherwise stipulate or the Court otherwise order.
   C. No party shall destroy any writing or other evidence in its
      possession or under its control which bears in any way upon the
      matters which are the subject of this litigation.
   D. Within the time for any party to file an answer or demurrer
      such party may alternatively file a notice of general appearance.
      In such event the time for filing of an answer or demurrer
      shall be extended to twenty (20) days following the first
      conference unless the Court shall, at that time, set a different
      schedule.
   E. Counsel for each party shall do a conflict check to determine
      whether such counsel might have a possible conflict of interest
      as to any present or contemplated future party.

BY ORDER OF THE COURT

# EXHIBIT D

1   ELIOT R. HUDSON (Bar No. 66251)
    eliot.hudson@dlapiper.com
2   DLA PIPER LLP (US)
    555 Mission Street, Suite 2400
3   San Francisco, California 94105-2933
    Tel: 415.836.2500
4   Fax: 415.836.2501

5

    Attorneys for Defendants
6   ALLSTATE INSURANCE COMPANY and
    ALLSTATE INDEMNITY COMPANY
7

8                  SUPERIOR COURT OF CALIFORNIA

9                     COUNTY OF CONTRA COSTA

10

11  ANDREA STEVENSON,                CASE NO. C15-01516

12            Plaintiff,             *[Assigned to the Hon. B. Goode, Dept. 17]*

13       v.                          **NOTICE TO STATE COURT AND
                                     ADVERSE PARTY OF REMOVAL
14  ALLSTATE INSURANCE CO.; and      OF ACTION TO FEDERAL COURT**
    ALLSTATE INDEMNITY CO.,
                                     Complaint Filed:    August 21, 2015
15            Defendants.            Discovery Cutoff:   Not Set
                                     Motion Cutoff:      Not Set
16                                   Trial Date:         Not Set

17

18

19

20

21

22

23

24

25

26

27

28

1   **TO PLAINTIFFS AND THEIR COUNSEL OF RECORD:**

2       Defendants Allstate Insurance Company and Allstate Indemnity Company

3   have filed with the United States District Court for the Northern District of

4   California, under United States District Court Case No. _____, a

5   Notice of Removal from the Superior Court of the State of California for the

6   County of Contra Costa pertaining to the above-entitled matter.  This notice is

7   given pursuant to 28 U.S.C. § 1446(d).

8       A copy of said Notice of Removal and supporting declaration are attached to

9   this Notice and are served and filed herewith as Exhibit A.[1]

10

11   Dated:  October 16, 2015                    DLA PIPER LLP (US)

12

13   By _____
    ELIOT R. HUDSON

14       Attorneys for Defendants
    ALLSTATE INSURANCE COMPANY

15       and ALLSTATE INDEMNITY
    COMPANY

16

17

18

19

20

21

22

23

24

25

26   ---

[1] In an effort to not burden the court with duplicative and voluminous documents, the exhibits

27   attached to the Notice of Removal have been served on Plaintiff, but omitted from this filing with
this Court.  The exhibits consists of copies of the complaint and other documents already

28   contained in this Court's file.

**PROOF OF SERVICE**

I am employed in the County of San Francisco, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  555 Mission Street, Suite 2400, San Francisco, California 94105.

On October 16, 2015, I served the following document(s) described as:

**NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL OF ACTION TO FEDERAL COURT**

on interested parties in this action by placing ☐ the original ☒ true copy(ies) thereof enclosed in sealed envelopes as stated below.

| | |
|---|---|
| David Borgen, Esq.<br>James Kan, Esq.<br>GOLDSTEIN, BORGEN, DARDARIAN & HO<br>300 Lakeside Drive, Suite 1000<br>Oakland, CA  94612<br>Telephone: (510) 763-9800<br>Facsimile:  (510) 835-1417<br>Email:  dborgen@gbdhlegal.com<br>Email:  jkan@gbdhlegal.com | Attorneys for Plaintiff<br>ANDREA STEVENSON |
| Jay Angoff, Esq.<br>Cyrus Mehri, Esq.<br>Steven Skalet, Esq.<br>MEHRI & SKALET PLLC<br>1250 Connecticut Ave., NW, Suite 300<br>Washington, DC 20036<br>Telephone: (202) 822-5100 | Attorneys for Plaintiff<br>ANDREA STEVENSON |
| Shannon Carson, Esq.<br>Peter Carson, Esq.<br>Jeff Osterwise, Esq.<br>BERGER & MONTAGUE, P.C.<br>1622 Locust Street<br>Philadelphia, PA 19103<br>Telephone:  (215) 875-3000<br>Facsimile:  (215) 875-4613 | Attorneys for Plaintiff<br>ANDREA STEVENSON |
| Jonathan K. Tycko, Esq.<br>Andrea R. Gold, Esq.<br>TYCKO & ZAVAREEI LLP<br>2000 L Street NW, Suite 808<br>Washington, DC 20036<br>Telephone:  (202) 973-0900<br>Facsimile:  (202) 973-0950 | Attorneys for Plaintiff<br>ANDREA STEVENSON |

1

☒   **(BY MAIL)**  The envelope was mailed with postage thereon fully prepaid. As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at San Francisco, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

2

3

4

5

☐   **(BY FACSIMILE)**  I delivered such document by facsimile to the following persons at the facsimile telephone numbers listed above.

6

7

☐   **(BY HAND DELIVERY)**  I delivered the within documents to Legal Support Services for delivery to the above address(es) with instructions that such envelope be delivered personally on October 15, 2015 to the above named individuals.

8

9

☐   **(BY OVERNIGHT MAIL)**  I am readily familiar with the firm's practice of collection and processing correspondence for mailing with an overnight courier service.  Under that practice it would be deposited with said overnight courier service on that same day with delivery charges thereon billed to sender's account, at San Francisco, California in the ordinary course of business.  The envelope was sealed and placed for collection and mailing on that date following ordinary business practices.

10

11

12

13

☒   **(STATE)**  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

14

15

☐   **(FEDERAL)**  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

16

17

Executed on October 16, 2015, at San Francisco, California.

18

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

19

20

__Joanne Caruso__
[Print Name Of Person Executing Proof]

[Signature]

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
SAN FRANCISCO

EAST\109287883.1

-- 4 --
NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL OF ACTION TO FEDERAL COURT